******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* GERALD
O'DONNELL
(AC 36606)

DiPentima, C. J., and Beach and Danaher, Js.*

*Syllabus*

Convicted of the crimes of bribery of a witness and tampering with a witness, the defendant appealed to this court. He claimed, inter alia, that the evidence was insufficient to support his conviction because the state failed to prove both that he intended to bribe a witness, S, when he purchased a television for her, or that he induced or attempted to induce her to testify falsely in a prior proceeding. The defendant, a private investigator, had been assisting attorneys for two men, G and T, who, in 2003, filed petitions for writs of habeas corpus seeking a new trial after having been convicted in 1995 of various crimes, including murder, in connection with the 1993 robbery of a retail store and the shooting death of its owner. S, who was a key witness in the criminal trial of G and T, testified that G and T were at the store on the morning of the murder. Prior to the criminal trial, S, in 1993, gave the police two written statements in which she averred that she was in the vicinity of the store on the morning of the robbery and murder, and identified G and T as having been involved in the incident. Later in 1993, S gave testimony at a hearing in probable cause that was consistent with the events she had described in her first written statement and with her later testimony in the 1995 criminal trial. In 2006, S gave the defendant a signed statement in which she recanted the testimony that she gave in the criminal trial and averred that she had not been present at the scene at the time of the murder and that her prior statements were untrue. The defendant thereafter drove S to visit her mother and to medical appointments, bought her food and a television, helped pay her rent and gave her money that she used to purchase a stereo. The defendant also told S that he did not think that G and T were guilty of the murder, and that she might be able to obtain money in the future, depending on the outcome of G's and T's habeas trial. At the habeas trial in 2009, S testified that she lied in the written statements that she gave to the police in 1993, and in her testimony both at the hearing in probable cause and at the criminal trial. After the habeas court rendered judgments granting G's and T's habeas petitions, the Supreme Court reversed the judgments and remanded the matter for a new habeas trial. In preparation for the second habeas trial, the police in 2011 met with S, who told the police that the defendant had convinced her that her testimony in the 1995 criminal trial was wrong and that she should not speak with the state. Although S told the police that she would testify truthfully in the second habeas trial and confirm the testimony that she gave in G's and T's criminal trial, she asserted her fifth amendment privilege in the second habeas trial and did not testify. The habeas court thereafter denied the habeas petition. *Held*:

1. The evidence was sufficient to support the defendant's conviction of bribery of a witness, as the jury reasonably could have found that the defendant intended to bribe S when he purchased the television for her; although S's 2006 recantation to the defendant predated his 2007 purchase of the television, the jury reasonably could have found that he gave the television to S with the intent to influence her testimony at the first habeas trial and to ensure that she testified consistent with her 2006 recantation, as the defendant knew that S had given different accounts as to where she was on the morning of the murder, he helped her pay her rent and gave her money that she used to purchase the stereo, and, after her recantation to him, he drove her to different locations, bought her candy and pizza, and told her that she might be able to obtain money depending on the outcome of the first habeas trial.

2. The defendant's conviction of tampering with a witness was supported by sufficient evidence demonstrating that he induced S to testify falsely in the first habeas trial: contrary to the defendant's claim, the jury was presented with evidence from which it could have concluded that S

testified truthfully in 1993 and 1995, and that the defendant had induced S to testify falsely in 2009, as S testified at both the hearing in probable cause in 1993 and the criminal trial in a manner that was consistent with her 1993 written statements to the police, in which she stated that she was in the vicinity of the store at the time of the murder and identified G and T as having been involved in the incident, and testimony from other witnesses supported the assertions that S made in 1993 and 1995; moreover, the defendant's unpreserved claim that the "one-witness-plus-corroboration" rule that is applicable to perjury prosecutions should apply to his conviction of witness tampering was not reviewable, as the claim was not of constitutional magnitude and, thus, not reviewable pursuant to a sufficiency of the evidence analysis, and, nevertheless, there was sufficient evidence of corroboration for the jury reasonably to conclude that the defendant induced or attempted to induce S to testify falsely at the first habeas trial.

3. The trial court did not abuse its discretion in denying the defendant's motion to set aside the verdict, in which he claimed that the evidence was confusing and was presented by the state in a one-sided manner in order to establish that S's 1993 and 1995 version of the events at issue was true; although the defendant claimed that the jury returned its verdict without having had access to highly relative and material information in the transcripts of S's 2006 recantation and her 2009 testimony in the first habeas trial, the defendant cross-examined a state's witness about S's 2006 statement and marked it as a defense exhibit for identification only but did not seek to have it admitted as a full exhibit, he provided no authority that required the state to offer and the court to admit into evidence S's 2009 habeas trial testimony, S's testimony at the first habeas trial was consistent with her testimony at the defendant's trial, and the jury did not send to the court any notes during deliberations indicating that it was confused by the court's jury instructions as to S's prior statements.

4. The defendant could not prevail on his unpreserved claim that the trial court improperly failed to include in its jury charge on witness tampering an instruction regarding the "one-witness-plus-corroboration" rule, which has been adopted for perjury prosecutions: that court properly charged the jury regarding the elements of tampering with a witness, and even if the "one-witness-plus-corroboration" rule applied to this case, there was sufficient corroboration evidence for the jury reasonably to conclude that the defendant induced or attempted to induce S to testify falsely in the first habeas trial; accordingly, the trial court's failure to charge the jury on the "one-witness-plus-corroboration" rule did not constitute plain error, and this court declined to exercise its supervisory authority over the administration of justice to require trial courts to instruct juries regarding that rule in cases such as the present one.

5. The defendant could not prevail on his claim that the trial court erred when it permitted S to invoke her fifth amendment privilege in front of the jury and refused his request to have her testify, instead, in a proffer outside of the jury's presence concerning her invocation of that privilege; notwithstanding the defendant's assertion that the state had reason to believe S would invoke her fifth amendment privilege, the record showed that the parties and the court assumed that S would invoke the privilege and that the state would immunize her, the state did not attempt to build its case out of inferences arising from the privilege and did not advocate for S to invoke the privilege in the jury's presence, the defendant had the opportunity to cross-examine S when she continued testifying after she invoked the privilege and received immunity, and the jury, which already had heard evidence indicating that on prior occasions S had given conflicting testimony and had invoked her fifth amendment privilege in the second habeas trial, reasonably could have inferred that S invoked the privilege to protect herself from criminal prosecution and not because there was a connection between her possible criminal conduct and the defendant's possible criminal conduct.

6. The trial court did not abuse its discretion when it granted the state's motion to quash the defendant's subpoena for information related to the witness protection program, as the subpoena was overly broad in that it sought records pertaining to all benefits provided by the witness protection program, rather than records supporting a claim that benefits had been provided with the intent to alter testimony or to induce false testimony, and it sought information that was protected from disclosure by the witness protection statute (§ 54-82t [j]); moreover, although the

defendant claimed that the conduct of his defense team was not materially different from that of the state in administering the witness protection program, and that the court, by quashing his subpoena, impaired his right to present a defense, including a selective prosecution claim, the purpose of that program is to protect witnesses from harm, whereas the offenses with which the defendant was charged involved altering testimony or inducing false testimony from a witness, and he presented no evidence that he was similarly situated to the individuals who administer the witness protection program for purposes of his selective prosecution claim.

Argued January 9—officially released July 18, 2017

(Appeal from Superior Court, judicial district of Tolland, Graham, J.)

*Procedural History*

Substitute information charging the defendant with two counts each of the crimes of tampering with a witness and perjury, and with the crime of bribery of a witness, brought to the Superior Court in the judicial district of Tolland, where the court, *Graham, J.*, granted the state's motion to quash; thereafter, the matter was tried to the jury; subsequently, the court granted the defendant's motion for a judgment of acquittal as to one count of tampering with a witness and denied the defendant's motion for a mistrial; verdict of guilty of bribery of a witness and one count of tampering with a witness; thereafter, the court denied the defendant's motion to set aside the verdict and rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Melissa Patterson*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Marcia A. Pillsbury*, assistant state's attorney, for the appellee (state).

*Opinion*

DANAHER, J. The defendant, Gerald O'Donnell, appeals from the judgment of conviction, rendered after a jury trial, of bribery of a witness in violation of General Statutes § 53a-149 and tampering with a witness in violation of General Statutes § 53a-151. On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction, (2) the trial court erred in refusing to set aside the guilty verdict as being against the weight of the evidence, (3) the court erred in instructing the jury on the elements of tampering with a witness, (4) the court erred in denying the defendant's request for a witness to testify, in a proffer, outside the presence of the jury, and (5) the court erred in granting the state's motion to quash the defendant's subpoena requesting information and materials related to the witness protection program. We affirm the judgment of the trial court.

This appeal comes before this court following extensive litigation involving the murder of Eugenio Vega, the owner of La Casa Green, a retail store on Grand Avenue in New Haven, in the early morning hours of July 4, 1993. An understanding of the facts and procedural history involving the prior litigation, as the jury reasonably could have found, is necessary in order to understand fully the issues presented in the defendant's appeal.

On the morning of Vega's murder, Pamela Youmans went to La Casa Green to make a purchase. Vega was alive when Youmans left the store. After Youmans left but while she was still in the vicinity of La Casa Green, she tossed a coin over her shoulder and a woman with a limp picked it up.[1] That same morning, Mary Boyd walked by La Casa Green and observed two black males inside the store. One of the males was taller than the other. Later that morning, when Boyd went into the store to make a purchase, Vega was not there and did not respond when Boyd called him, so Boyd called 911. Boyd then took some quarters, cigarettes and food stamps and left before the police arrived because she knew that there was an outstanding warrant for her arrest. When the police responded to the call, they discovered Vega, who had been shot and was deceased, with his hands tied behind his back.

The New Haven Police Department questioned Doreen Stiles in the course of the investigation into Vega's murder. Stiles provided two written statements to the New Haven Police Department. In her first statement, dated July 29, 1993, Stiles described how she was in the vicinity of Vega's store on the morning of the murder when she saw a black male enter the store. Because the man frightened her, Stiles hid next door between the store and an alleyway, where she heard arguing from inside and someone asking Vega for money and to open the safe. She then heard a gunshot

and saw two black males leave the store.[2] In her statement of July 29, 1993, Stiles identified George M. Gould as one of the individuals coming out of the store on the date of the murder. On August 2, 1993, Stiles gave a second written statement in which she identified Ronald Taylor as the other individual involved in the incident. At a probable cause hearing on October 14, 1993, Stiles testified consistently with her July 29, 1993 statement to the police. She also testified that she saw Boyd in the vicinity of the store on the morning of the murder. At the criminal trial of Gould and Taylor in January, 1995, Stiles, who testified that she had a disability in her leg, identified Taylor and Gould as being present at Vega's store on the morning of his murder.[3] Following a jury trial, Taylor and Gould were each convicted of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2), 53a-8 and 53a-49, and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2).[4] Our Supreme Court affirmed the judgments of the trial court, with the exception of Taylor's conviction of attempt to commit robbery in the first degree.[5] *State* v. *Gould*, 241 Conn. 1, 24, 695 A.2d 1022 (1997).

In 2003, following their convictions, Taylor and Gould filed petitions for writs of habeas corpus. At that time, Taylor was represented by Attorney Peter Tsimbidaros and Gould was represented by Attorney Joseph Visone. The defendant was assisting Tsimbidaros and Visone as a private investigator. The defendant previously had worked as an inspector with the New Haven state's attorney's office. At some point, the defendant went to see Stiles, who was in a nursing home in Manchester undergoing rehabilitation for her legs, and indicated that he was investigating Vega's murder. They spoke briefly and, upon questioning by the defendant, Stiles told the defendant that she was not present at the scene at the time of the murder.[6] On December 6, 2006, Stiles gave a signed statement to the defendant in which she indicated that her prior statements regarding the murder had been untrue.

Following the defendant's initial meeting with Stiles at the nursing home, the defendant continued to visit Stiles approximately once a week for "a year, maybe more." During those visits, the defendant came to the nursing home and checked to make sure he knew where Stiles was and kept her informed about the case. On two occasions during this period of time, the defendant drove Stiles to visit her mother. He also drove her to doctor appointments and bought her pizza and candy. On May 12, 2007, the defendant purchased a television and service plan for Stiles for a total of $204.43. He also gave Stiles money that she used to buy a stereo and told her that she might be able to obtain money in

the future depending on the outcome of Taylor's and Gould's habeas trial.[7]

In 2009, Stiles left the nursing home and moved into a motel with her husband, where she lived for approximately one year. During this time, the defendant periodically visited the motel to make sure that Stiles still lived there and to tell her what was happening with the trial. When Stiles was living in the motel, the defendant took her to visit her mother. Stiles and her husband usually paid the monthly rent of $930 at the motel. There were "a couple of months," however, when the defendant helped to pay the rent.[8] During this time, the defendant told Stiles that Taylor and Gould were trying to get a new trial, and that he did not think they were guilty of Vega's murder. According to Stiles, she and the defendant had become friends and they sometimes discussed their personal lives.

On August 3, 2009, Taylor's and Gould's habeas trial began. At that trial, Stiles testified that she had lied about seeing Taylor and Gould when she gave the two prior statements to the police in 1993, in her testimony at the probable cause hearing in 1993 and in her 1995 criminal trial testimony.[9] On March 17, 2010, the habeas court, *Fuger*, *J.*, granted the habeas petitions, concluding that Taylor and Gould had met their burden of proof with regard to their claim of actual innocence.[10] On July 19, 2011, our Supreme Court reversed the judgments of the habeas court and remanded the matters for a new habeas trial.[11] *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 571, 22 A.3d 1196 (2011).

Once the habeas trial ended, the defendant no longer visited with or spoke to Stiles. This surprised Stiles because prior to the trial, their friendship had been "somewhat consistent" and he had told her that he would stay in touch with her. After the habeas trial in 2009, Stiles and her husband moved from the motel to an apartment in New Haven. On July 6, 2011, Stephen Coppola, a detective with the New Haven Police Department, and Edwin Rodriguez, an inspector with the chief state's attorney's office, went to see Stiles at her apartment in New Haven to verify her address for the second habeas trial that was coming up.[12] She accompanied them to the New Haven Police Department, where she indicated that the defendant had "gotten inside [her] head" and overwhelmed her when he talked about the trial.[13] Stiles indicated that the defendant had convinced her that her testimony in the previous trial was wrong and that she "didn't see what she saw." Finally, Stiles informed Coppola and Rodriguez that the defendant had provided her with a television and stereo. On July 13, 2011, John H. Bannon, Jr., an inspector with the chief state's attorney's office, went to Stiles' apartment to talk to her regarding the statements she had made to the other inspectors. While he was there, Bannon took photographs of a television and stereo. At that

meeting, Stiles told Bannon that the defendant had told her not to speak with the state at all and that the defendant continually was harassing and bothering her.

The second habeas trial began on March 19, 2012. Because Taylor had died in 2011, the second habeas petition proceeded as to Gould only. Tsimbidaros and Visone both represented Gould at the second habeas trial. In preparation for the second habeas trial, Visone, Tsimbidaros and the defendant met with Stiles at her apartment in New Haven on April 11 or 12, 2012. As Tsimbidaros, Visone and the defendant were leaving Stiles' apartment, the defendant shook his head and said, in response to a question by Tsimbidaros, "the places we've had to go and the things we've had to do, you don't want to know."

On May 7, 2012, prior to the conclusion of the second habeas trial, the police executed a search warrant at Stiles' apartment and recovered the television and stereo. That same date, the police arrested the defendant at his home. On May 23, 2012, Bannon served a subpoena on Stiles to testify at the second habeas trial. At that time, Stiles told Bannon that she was going to tell the truth and confirm her original trial testimony. At the second habeas trial, however, Stiles asserted her fifth amendment privilege and did not testify. On September 18, 2012, the second habeas judge, *Sferrazza*, *J.*, denied the second habeas petition.[14]

In this case, the defendant was initially charged with one count of bribery of a witness, in violation of § 53a-149, and two counts of tampering with a witness in violation of § 53a-151. The state subsequently filed a substitute information that added two counts of perjury in violation of General Statutes § 53a-156. Following a jury trial in 2013, the defendant was found guilty of bribery of a witness and one count of tampering with a witness.[15] As a result of his conviction, the defendant was sentenced to a total effective term of four years of incarceration. The defendant then filed the present appeal.

I

The defendant first argues that the evidence was insufficient to establish his guilt of the crimes charged. With regard to the bribery charge, the defendant argues that the state failed to prove that his act of purchasing a television for Stiles on May 12, 2007 was performed with the specific intent to influence her testimony at the habeas hearing in 2009. With regard to the tampering with a witness charge, the defendant first argues that the state failed to prove that he induced or attempted to induce Stiles to testify falsely. The defendant further argues that the state failed to satisfy the "one-witness-plus-corroboration" standard of proof.

Before considering the defendant's specific claims, we set forth the applicable standard of review. "The

two part test this court applies in reviewing the sufficiency of the evidence supporting a criminal conviction is well established. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Lewis*, 303 Conn. 760, 767, 36 A.3d 670 (2012). "This court cannot substitute its own judgment for that of the [finder of fact] if there is sufficient evidence to support the [finder of fact's] verdict." (Internal quotation marks omitted.) *State* v. *Andriulaitis*, 169 Conn. App. 286, 292, 150 A.3d 720 (2016).

## A

We first consider the defendant's claim that the evidence was insufficient to establish that he was guilty of bribery of a witness in violation of § 53a-149. That statute provides: "A person is guilty of bribery of a witness if he offers, confers or agrees to confer upon a witness any benefit to influence the testimony or conduct of such witness in, or in relation to, an official proceeding." General Statutes § 53a-149 (a). To obtain a conviction under § 53a-149 (a), "[t]he state . . . was required to establish the following: (1) that the defendant offered, conferred or agreed to confer a benefit, (2) to a witness, (3) with the intent of influencing the witness' testimony or conduct in relation to an official proceeding." (Internal quotation marks omitted.) *State* v. *Brantley*, 164 Conn. App. 459, 472, 138 A.3d 347, cert. denied, 321 Conn. 918, 136 A.3d 1276 (2016). "[I]t is unnecessary that the thing offered or given is to induce a witness to testify falsely. It is sufficient if it were given with intent to influence his testimony or conduct. In the common acceptation of the term, the verb influence means to alter, move, sway, or affect. . . . If the promise or payment [was] made with the intent to affect the testimony or conduct of the prospective witness so that he would thereby be induced to testify more or less favorably to a party than he otherwise would have done, an intent to influence within the meaning of the statute exists." (Internal quotation marks omitted.) Id., 473.

"[I]n determining the defendant's guilt as to the bribery charge, the jury was required to determine what the defendant intended when he made the offer. Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . Moreover, the [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . Intent may be and usually is inferred from conduct. Of necessity, it must be proved by the statement or acts of the person whose act is being scrutinized and ordi-

narily it can only be proved by circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Davis*, 160 Conn. App. 251, 259, 124 A.3d 966, cert. denied, 320 Conn. 901, 127 A.3d 185 (2015).

In the information, the state alleged that "on or about May 12, 2007, in the town of Manchester, the defendant conferred a benefit upon a witness to influence the witness' testimony in an official proceeding . . . ." According to the defendant, there was insufficient evidence to establish that the benefit conferred on Stiles on May 12, 2007, was performed with the specific intent to influence Stiles' 2009 testimony in the first habeas trial. We disagree.

On December 6, 2006, Stiles gave a statement to the defendant recanting her initial trial testimony. On May 12, 2007, the defendant bought Stiles a television and service plan. Although Stiles' December 6, 2006 recantation predated the gift of the television by approximately five months, the jury reasonably could have concluded that the defendant gave the television to Stiles with the intent to influence her testimony at the first habeas trial in 2009. Following the December 6, 2006 recantation, the defendant continued to visit Stiles over the course of the next "year, maybe more." He drove her to visit her mother or to doctor appointments, bought her candy and pizza, and told her that she might be able to obtain money depending on the outcome of the first habeas trial. In addition to the television, the defendant also gave Stiles money that she used to purchase a stereo. He also helped her pay the rent when she lived in a motel. During this time, the defendant told Stiles that Taylor and Gould were trying to get a new trial, and that he did not think they were guilty of Vega's murder. In discussing this case, the defendant made a comment indicating that Visone and Tsimbidaros did not want to know "the places we've had to go and the things we've had to do . . . ."

Once the first habeas trial ended the defendant no longer visited Stiles. Stiles later told the police that the defendant had "gotten inside [her] head" and had convinced her that her prior testimony was wrong and that she "didn't see what she saw." The defendant knew that Stiles had given different accounts as to where she was on the morning of the murder. Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant purchased the television for Stiles to ensure that she testified consistently with the December 6, 2006 recantation when she testified at the first habeas trial. We conclude, therefore, that the evidence was sufficient to convict the defendant on the charge of bribery of a witness.[16]

B

The defendant next argues that the evidence was

insufficient to prove that he was guilty of the charge of tampering with a witness in violation of § 53a-151 (a). That statute provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." General Statutes § 53a-151 (a). "[T]he witness tampering statute has two requirements: (1) the defendant believes that an official proceeding is pending or about to be instituted; and (2) the defendant induces or attempts to induce a witness to engage in the proscribed conduct." *State* v. *Ortiz*, 312 Conn. 551, 562, 93 A.3d 1128 (2014).

"The language of § 53a-151 plainly warns potential perpetrators that the statute applies to *any conduct* that is intended to *prompt a witness* to testify falsely . . . in an official proceeding that the perpetrator believes to be pending or imminent. . . . A defendant is guilty of tampering with a witness if he intends that his conduct directly cause a particular witness to testify falsely . . . . So interpreted, § 53a-151 applies to conduct intentionally undertaken to undermine the veracity of testimony given by a witness. . . . The statute applies to successful as well as unsuccessful attempts to induce a witness to render false testimony." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Carolina*, 143 Conn. App. 438, 444, 69 A.3d 341, cert. denied, 310 Conn. 904, 75 A.3d 31 (2013).

In the information, the state alleged that "on diverse dates . . . from May, 2007 through August, 2009, in the town of Manchester, when he believed that an official proceeding was pending, the defendant induced or attempted to induce a witness to testify falsely in that official proceeding . . . ." According to the defendant, it is uncertain whether Stiles was truthful in 1993 and 1995 (when she gave statements and testified about seeing Gould and Taylor at La Casa Green at the time of Vega's murder), or whether she was truthful in 2006, 2009 and 2013 (when she made statements and testified that she had lied in 1993 and 1995, and was not present and did not see Gould and Taylor at La Casa Green at the time of Vega's murder). The defendant argues that he believes that Stiles lied in 1993 and 1995, when she inculpated Gould and Taylor, and that she told the truth in 2006, 2009 and 2013, when she exculpated Gould and Taylor. Absent evidence that Stiles was truthful in 1993 and 1995, the defendant argues that the jury could not reasonably have concluded that the defendant specifically intended and induced her to testify falsely in 2009. We disagree.

The jury was presented with the following evidence from which it reasonably could have concluded that Stiles testified truthfully in 1993 and 1995, and that the defendant induced Stiles to testify falsely in 2009.

Following Vega's murder in 1993, Stiles gave two written statements to the police in which she stated that she was in the vicinity of the store at the time of the murder, and she identified Gould and Taylor as the individuals involved in the incident. She testified consistently with these statements at the probable cause hearing in 1993 and the criminal trial in 1995. Youmans testified that she saw a woman with a limp in the vicinity of the store on the morning of the murder. Stiles testified at the criminal trial in 1995 that she has a disability in her leg and cannot move quickly. After Gould and Taylor were convicted in 1995, the defendant, who previously had worked with the New Haven state's attorney's office, visited Stiles in his capacity as an investigator for Visone and Tsimbidaros, the attorneys for Gould and Taylor in the first habeas action. After a very brief conversation, the defendant stated: "[Y]ou really weren't there, were you?" In response to this question, Stiles responded that she was not there and gave a signed statement indicating that her prior statements were untrue. The defendant then followed up with weekly visits to Stiles in which he would give her gifts and drive her to different locations. He also told her that she might be able to obtain money in the future if Gould and Taylor were successful in the habeas trial.[17] On the basis of this evidence, the jury reasonably could have concluded that the defendant induced or attempted to induce Stiles to testify falsely at an official proceeding.

In the second part of his claim that the evidence was insufficient with regard to his conviction of tampering with a witness, the defendant argues that a conviction of tampering with a witness requires the same degree of proof as that necessary to support a perjury conviction, i.e., the "one-witness-plus-corroboration" rule, and in this case, the evidence did not satisfy that standard. The defendant acknowledges that his claim is unpreserved and seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*); or, in the alternative, the plain error doctrine; Practice Book § 60-5; or our supervisory authority over the administration of justice. We disagree.

We first set forth the applicable standard of review. "Under *Golding*, a defendant may prevail on an unpreserved claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Tarver*, 166 Conn. App. 304,

321, 141 A.3d 940, cert. denied, 323 Conn. 908, 150 A.3d 683 (2016).

According to the defendant, *Golding* review is warranted because the record is adequate for review and a claim of evidentiary insufficiency is of constitutional magnitude alleging the violation of a fundamental right. While we agree that "any defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*"; (internal quotation marks omitted) *State* v. *Revels*, 313 Conn. 762, 777, 99 A.3d 1130 (2014), cert. denied,     U.S.    , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015); we disagree that the defendant's claim is one of evidentiary insufficiency. The defendant, rather, is asking, for the first time on appeal, that we impose the "one-witness-plus-corroboration" rule that is applicable to a charge of perjury and apply it to his conviction of tampering with a witness.

The "one-witness-plus-corroboration" rule is not an element of the crime of tampering with a witness for purposes of a sufficiency of the evidence analysis. "[T]he two witness rule is a quantitative rule of evidence which provides that a person may not be convicted of perjury upon the testimony of a single witness as to the falsity of the statement made. . . . Originally, the rule required that in order to sustain a conviction for perjury, the falsity of the defendant's oath had to have been proven by the sworn testimony of two or more live witnesses. Over the years, however, the rule has been modified to permit a conviction upon the sworn testimony of one live witness if that testimony is supported by proof of corroborative circumstances, the so-called one-witness-plus-corroboration rule. . . . It has been said that [t]he rule of evidence in perjury cases presents an almost unique exception to the general rule that evidence which is sufficient to convince the jury of the defendant's guilt beyond a reasonable doubt is sufficient to sustain a conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Sanchez*, 204 Conn. 472, 477, 528 A.2d 373 (1987).

In *Sanchez*, our Supreme Court specifically referred to the two witness rule for perjury as a "quantitative rule of evidence . . . ." Id.; see also *United States* v. *Koonce*, 485 F.2d 374, 377 (8th Cir. 1973) (two witness rule in perjury cases not constitutionally mandated). In *State* v. *Castillo*, 121 Conn. App. 699, 712, 998 A.2d 177, cert. denied, 297 Conn. 929, 998 A.2d 1196, cert. denied, 562 U.S. 1094, 131 S. Ct. 803, 178 L. Ed. 2d 537 (2010), we declined to review the defendant's claim that the court improperly charged the jury with regard to the two witness rule contained in General Statutes § 54-83, which provides in relevant part that "[n]o person may be convicted of any crime punishable by death . . . without the testimony of at least two witnesses, or that which is equivalent thereto." In discussing that statute,

we stated that "§ 54-83 is a statutory enactment that prescribes the nature of the evidence that the state must adduce to prove its case. Unlike the reasonable doubt rule . . . the evidentiary burden imposed by § 54-83 is not constitutionally compelled." (Citations omitted; internal quotation marks omitted.) *State* v. *Castillo*, supra, 712. On the basis of the foregoing, we conclude that the defendant's unpreserved claim that the "one-witness-plus-corroboration" rule should apply to his conviction of tampering with a witness is not of constitutional magnitude and, therefore, is not reviewable pursuant to a sufficiency of the evidence analysis.

Finally, even if we were to review the defendant's claim and conclude that the "one-witness-plus-corroboration" rule is applicable to this case, the state presented sufficient evidence of corroboration for the jury reasonably to conclude that the defendant induced or attempted to induce Stiles to testify falsely at the first habeas trial. The testimony from Youmans and Boyd supported a finding that Stiles was in the vicinity of the store on the morning of the murder in 1993. Stiles maintained, until after Gould's and Taylor's criminal trial in 1995, that she had been at that location. On December 6, 2006, the defendant stated to her: "[Y]ou really weren't there, were you?" In addition to the testimony from Stiles regarding the defendant's visits with her, the jury heard evidence that the defendant purchased a television for her and gave her money to purchase a stereo.[18] In addition to Stiles' testimony that the defendant had told her that she might be able to obtain money if Gould and Taylor were successful in the habeas trial, the parties stipulated that on March 18, 2011, after the favorable ruling in the first habeas trial, Tsimbidaros filed a claim for compensation with the state Office of the Claims Commissioner on behalf of Gould and Taylor. Finally, the jury heard evidence that the defendant made a comment indicating that Visone and Tsimbidaros did not want to know "the places we've had to go and the things we've had to do" regarding this case.

On the basis of the foregoing, and applying the applicable standard of review, we conclude that the evidence was sufficient to convict the defendant on the charge of tampering with a witness.[19]

## II

The defendant next claims that the court erred in denying his motion to set aside the guilty verdict as against the weight of the evidence. According to the defendant, the evidence in this case was highly confusing, due in large part to the state's selective presentation of evidence and its reliance on statements admitted pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[20] We disagree.

"The proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and a motion for a new trial is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Citation omitted; internal quotation marks omitted.) *State* v. *Fred C.*, 167 Conn. App. 600, 606, 142 A.3d 1258, cert. denied, 323 Conn. 921, 150 A.3d 1150 (2016).

"As we repeatedly have emphasized, the trial court is uniquely situated to entertain a motion to set aside a verdict as against the weight of the evidence because, unlike an appellate court, the trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence. . . . Indeed, we have observed that, [i]n passing upon a motion to set aside a verdict, the trial judge must do just what every juror ought to do in arriving at a verdict. . . . [T]he trial judge can gauge the tenor of the trial, as we, on the written record cannot, and can detect those factors, if any, that could improperly have influenced the jury." (Internal quotation marks omitted.) *State* v. *Scott C.*, 120 Conn. App. 26, 38, 990 A.2d 1252, cert. denied, 297 Conn. 913, 995 A.2d 956 (2010).

The defendant's primary argument is that the state presented evidence in a one-sided manner in order to establish that Stiles' original version of the events was truthful. The defendant points out that the state offered into evidence Stiles' initial statement to the police, dated July 29, 1993, a redacted transcript of Stiles' October 14, 1993 testimony at the hearing in probable cause and a redacted transcript of her January 19, 1995 criminal trial testimony. The state also provided a three and one-half hour videotape of Stiles' criminal trial testimony. The transcription of Stiles' initial recantation on December 6, 2006, however, was marked as an exhibit for identification only, and Stiles' 2009 habeas trial testimony never was placed into evidence. According to the defendant, this resulted in the jury's returning a guilty verdict without having had access to highly relevant and material information. Citing *State* v. *Chin Lung*, 106 Conn. 701, 704, 139 A. 91 (1927), the defendant contends that the verdict should be set aside because the jury was "influenced by lack of knowledge or understanding . . . ." (Emphasis omitted; internal quotation marks omitted.) In support of this claim, the defendant

argues that the trial became "a trial within a trial within a trial . . . ." (Internal quotation marks omitted.) On the contrary, a central question before the jury was whether it should credit Stiles' recantation of her original testimony and statements.

Stiles' 2006 statement was marked as a defense exhibit for identification. The defendant did not seek to have this statement admitted as a full exhibit during Stiles' testimony; he did, however, cross-examine John M. Waddock, a supervisory assistant state's attorney in the New Haven state's attorney's office, with regard to the statement.[21] Stiles' 2009 habeas testimony appears to be consistent with her testimony at the defendant's trial, and the defendant has not pointed to any authority requiring the state to offer and the court to admit the 2009 habeas trial testimony under those circumstances.[22]

The defendant also contends that confusion may have arisen as a result of the court's charge concerning its consideration of Stiles' previous statements. Specifically, the court charged that Stiles' 1993 statement to the police, her 1993 testimony at the hearing in probable cause and her 1995 criminal trial testimony could be considered for credibility and substantive purposes; her statement to the police in 2011 recanting the previous recantation that she made to the defendant in 2006 could be considered only for credibility purposes.[23] "The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Fernandez*, 169 Conn. App. 855, 870, 153 A.3d 53 (2016). The record reflects that the court marked the jury charge as an exhibit and provided that exhibit to the jury for its use during deliberations. We note that during its deliberations, the jury did not send any notes to the court indicating that it was confused by this charge. The only notes from the jury pertained to evidence of audiotapes alleged to have been made of Youmans.[24]

On the basis of the foregoing, we cannot conclude that the court abused its discretion in denying the defendant's motion to set aside the verdict.

### III

The defendant next argues that the court, when instructing the jury regarding the elements of tampering with a witness, erred in failing to instruct the jury regarding the "one-witness-plus-corroboration" rule adopted for perjury prosecutions in *State* v. *Sanchez*, supra, 204 Conn. 472. According to the defendant, whether the corroboration rule is viewed as an "element" of the crime or as the "quantum of evidence" required to prove falsity, the failure to give the instruction had the same harmful effect and clearly contributed to the verdict. The defendant concedes that this instructional claim was not preserved at trial, but requests that

we consider it pursuant to the plain error doctrine; Practice Book § 60-5; or our supervisory authority over the administration of justice.[25] We conclude, in accordance with our discussion of the "one-witness-plus-corroboration" rule in the defendant's sufficiency of the evidence claim, that the defendant cannot prevail on this related instructional claim.

The court properly charged the jury regarding the elements of tampering with a witness. The court further instructed that "[i]f you think a witness has deliberately testified falsely, you should carefully consider whether you should rely on . . . any part of that witness' testimony."[26] As we stated in part I B of this opinion, even if we assume that the "one-witness-plus-corroboration" rule applies to this case, the state presented sufficient evidence of corroboration for the jury reasonably to conclude that the defendant induced or attempted to induce Stiles to testify falsely at the first habeas trial. As pointed out by the state, evidence of the defendant's intent to induce Stiles' false testimony came from multiple sources, all of which corroborated each other. In particular, the defendant's statement indicating that Visone and Tsimbidaros did not want to know "the places we've had to go and the things we've had to do" regarding this case provides corroboration that the defendant was attempting to induce Stiles to testify falsely at the first habeas trial. Accordingly, we conclude that the court's failure to charge the jury regarding the "one-witness-plus-corroboration" rule was not plain error requiring reversal of the judgment. This is not a case in which "the existence of the error is so obvious that it affects the fairness of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–96, 134 A.3d 560 (2016). Similarly, we decline to exercise our supervisory authority over the administration of justice to require that the *Sanchez* corroboration instruction be given in cases such as the present case.

IV

The defendant next argues that the court erred in refusing the defense request to have Stiles testify in a proffer, outside the presence of the jury. According to the defendant, the denial of that request allowed the prosecution to elicit, in the presence of the jury, Stiles' invocation of the fifth amendment.

The following additional facts are relevant to our resolution of this claim. On the second day of trial, the state indicated its intent to interrupt Bannon's testimony in order to call Stiles to the witness stand. The defendant objected and, during the discussion that followed, argued that the state did not know what the substance of Stiles' testimony would be.[27] Thereafter, the state interrupted Bannon's testimony to call Stiles. Outside the presence of the jury, the defendant argued that Stiles had "an unusual relationship with the truth

and may or may not recall things the same way twice from moment to moment . . . ." The defendant understood, however, that it was Stiles' "present intent . . . to take the [witness] stand and testify that the truth is what she said in 2009 . . . and that her testimony in [1995] was untruthful." The defendant argued that the state was offering Stiles' testimony solely for the purpose of thereafter impeaching her with a prior inconsistent statement under *State* v. *Whelan*, supra, 200 Conn. 753, which was improper. The defendant renewed his claim that the state did not know what Stiles was going to say, but argued that it "[doesn't] matter what she says. The state simply wants her up there as a warm pulse, which will either agree with them in its theory of this case or disagree, in which case it will seek to offer her prior inconsistent testimony."

The defendant noted that the state was prepared to immunize Stiles and asked the court to advise Stiles with regard to her fifth amendment rights. The court declined to do so, noting that Stiles had her own attorney who was present in court, and had counsel when she invoked the fifth amendment in the second habeas trial. The defendant then asked that Stiles "testify . . . by way of proffer outside the jury's presence" because the state did not know what she was going to say and could not offer her testimony solely for the purpose of impeaching her. The court responded by noting that Stiles had testified inconsistently in the prior proceedings, making it difficult to have "great confidence" in the substance of Stiles' testimony.[28] The defendant then moved for a mistrial, arguing that the state had "made no proffer, nor can [it] make a proffer of what this witness will say . . . ." During the ensuing discussion, the court "anticipated that [Stiles was] going to take the fifth amendment when she [took] the witness stand . . . and be granted immunity and only then testify, and she's testified in a contradictory fashion on previous occasions." The state subsequently declined to make a proffer, noting that the defense was "not entitled to a preview of each witness" and that Stiles had been "so contaminated, so tampered with, bribed, pushed by this defendant, that's why we're bringing these charges." Ultimately, the court denied the motion for a mistrial.

William Paetzold, Stiles' attorney, then introduced himself and represented that Stiles was going to assert her fifth amendment right. Paetzold inquired about what procedure would be followed for her to do so, and the court instructed that it needed to be done in the presence of the jury and in response to specific questions. There was no objection to that procedure. The parties agreed that Paetzold could stand behind Stiles, who was in a wheelchair, until the fifth amendment issues were resolved. In the presence of the jury, the state then called Stiles as a witness. After some preliminary questions, the prosecutor asked Stiles to explain "how it was that [she] personally became involved in the

criminal investigation [pertaining to] Mr. Vega." At that point, Paetzold interrupted and stated that he was advising Stiles to invoke her fifth amendment right concerning the specifics of her involvement in the case. The court asked Stiles if she was invoking her fifth amendment right and Stiles answered affirmatively. The prosecutor then immunized Stiles pursuant to General Statutes § 54-47a (1). The defendant inquired whether the immunity pertained to federal as well as state prosecution. After addressing the defendant's concern, the court noted that Stiles had counsel, and, as the defendant was not making an objection, the state could proceed. The state finished its direct examination, and the defendant cross-examined Stiles without Stiles invoking her fifth amendment right again.

According to the defendant, the court committed evidentiary trial error when it refused his request to have Stiles testify, initially, by way of a proffer outside the jury's presence. The defendant argues that this ruling allowed the state to strengthen its case by means of an inference arising from Stiles' invocation of the privilege in the jury's presence. The state counters that the defendant's unpreserved evidentiary claim should not be reviewed. If reviewed, the state argues, that the defendant cannot prevail because allowing this testimony was neither erroneous nor harmful. We will review this claim but agree with the state that the defendant cannot prevail on the merits of this claim.

We initially note that the defendant's claim that the court improperly allowed Stiles to invoke her fifth amendment privilege in the presence of the jury is a claim of evidentiary trial error. *State* v. *Dennison*, 220 Conn. 652, 661, 600 A.2d 1343 (1991). Thus, "the claim is reviewable under the standard of harmless error applicable to nonconstitutional claims . . . and the defendant bears the burden of establishing that the trial court's erroneous ruling was harmful to him in that it probably affected the outcome of the trial." (Citation omitted.) Id.

According to the state, the defendant argued at trial that the court should have granted his request for a testimonial proffer to determine which version of Stiles' prior testimony she was going to set forth; on appeal, however, he argues that it was to prevent Stiles from invoking her fifth amendment right in the presence of the jury. Because the articulated basis for the request at trial differs from the argument raised on appeal, the state argues that we should decline to review this claim. Although "we will not review a claim unless it was distinctly raised at trial . . . we may . . . review legal arguments that differ from those raised before the trial court if they are subsumed within or intertwined with arguments related to the legal claim raised at trial." (Citations omitted.) *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 203, 982 A.2d 620 (2009). In the

present case, although the specific argument in support of the defendant's request for a proffer differs from the argument raised at trial, we conclude that we may review it, as it is subsumed within or intertwined with the claim raised in the trial court.

Turning to the merits of this claim, "[i]t is widely held that it is improper to permit a witness to claim a testimonial privilege in front of the jury where the witness's intention not to testify is known beforehand. . . . Our appellate courts follow that general rule. Our Supreme Court has stated [that] . . . [i]t is firmly established that [n]either [the state nor the defendant] has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him. . . . The rule is grounded not only in the constitutional notion that guilt may not be inferred from the exercise of the Fifth Amendment privilege but also in the danger that a witness's invoking the Fifth Amendment in the presence of the jury will have a disproportionate impact on their deliberations. The jury may think it high courtroom drama of probative significance when a witness takes the Fifth. In reality the probative value of the event is almost entirely undercut by the absence of any requirement that the witness justify his fear of incrimination and by the fact that it is a form of evidence not subject to cross-examination. . . . Accordingly, we have held that a witness may not be called to the stand in the presence of the jury merely for the purpose of invoking his privilege against self-incrimination. . . . Such testimony is not relevant, and could be prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Iverson*, 48 Conn. App. 168, 173–74, 708 A.2d 615, cert. denied, 244 Conn. 930, 711 A.2d 728 (1998).

"In *Namet* [v. *United States*, 373 U.S. 179, 186–87, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963)], the United States Supreme Court identified two areas where prejudice can occur. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." (Citations omitted; internal quotation marks omitted.) *State* v. *Dennison*, supra, 220 Conn. 661–62. "[I]n order to determine whether the ruling of the trial court was prejudicial, we must consider the invocation of the privilege in response to the specific questions in the context and circumstances of the case." Id., 662.

With regard to the first area mentioned in *Namet*,

the defendant argues that although the state had every reason to believe that Stiles would invoke her fifth amendment privilege, it resisted the defendant's efforts to obtain a testimonial proffer outside the presence of the jury. According to the defendant, this is a strong indication that the state wanted the jury to see Stiles invoke the privilege before she was given immunity. The record, however, reveals that the parties and the court assumed that Stiles would invoke the privilege, and that the state would immunize her. The state objected to the defendant's request for a proffer on the ground that the defendant was not entitled to "a preview of each witness . . . ." The state did not attempt to build its case out of inferences arising from the privilege, and it did not advocate for Stiles to invoke the privilege in the jury's presence. See *Namet* v. *United States*, supra, 373 U.S. 189 (prosecution's "few lapses" in asking questions held to be privileged did not amount to "planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify" particularly when "defense counsel not only failed to object on behalf of the defendant, but in many instances actually acquiesced in the procedure as soon as the rights of the witnesses were secured"); *United States* v. *Puntillo*, 440 F.2d 540, 543 (7th Cir. 1971) (The United States Court of Appeals for the Seventh Circuit concluded that "[t]he prosecution made no conscious or flagrant attempt to bolster its case as the result of the invocation by the witness of his testimonial privilege. In fact, it was the judge who insisted that a record of the witness' refusal to testify be made in the jury's presence."). With regard to the second area set forth in *Namet*, we note that after Stiles invoked her fifth amendment privilege and received immunity, she continued her testimony, and the defendant had the opportunity for cross-examination. See *Namet* v. *United States*, supra, 189 (indicating that "[t]he effect of these questions was minimized by the lengthy nonprivileged testimony" given by the witnesses).

We disagree with the defendant that allowing Stiles to invoke the privilege in front of the jury permitted the jury to conclude that she was a recalcitrant or obstructionist witness who would not testify unless given immunity. On the contrary, the jury had already heard evidence indicating that Stiles had given conflicting testimony on prior occasions and that she had invoked the fifth amendment privilege in the second habeas trial. We likewise disagree with the defendant's contention that the invocation permitted the jury to infer that there was a direct connection between Stiles' possible criminal conduct and the defendant's possible criminal conduct. Contrary to the defendant's claim, the jury reasonably could infer that Stiles, who was represented by counsel, invoked the privilege to protect herself from criminal prosecution and not because she was connected to the defendant.

Accordingly, because the defendant has not established that the trial court committed evidentiary error, he cannot prevail on this claim.

V

The defendant's final claim is that the court erred in quashing the defense subpoena for information and materials related to the witness protection program. We disagree.

The following facts are necessary for the resolution of this claim. Prior to the commencement of trial, the defendant filed a subpoena, directed to the Office of the Chief State's Attorney, asking for "[r]ecords of the Witness Protection Program; including number of witness[es] who applied to Program, number of witnesses admitted; terms of acceptance; cost of each witnesses' participation; moneys paid to or on behalf of witnesses; whether any such witnesses or state agents were prosecuted for crimes against the administration of justice in connection with Witness Protection Program activities." The defendant also filed an "omnibus motion for further discovery, selective prosecution hearing, and dismissal."[29] The state filed a motion to quash the subpoena on the grounds that it was overly broad, sought documents that were not relevant, and sought to compel the production of documents that included privileged and sensitive information. The defendant filed an objection to the state's motion to quash.

On September 18, 2013, the court heard arguments on the defendant's omnibus motion and the state's motion to quash. The defendant argued that the prosecution of the defendant reflected "a vindictive reaction by the state to a defense team that embarrassed the state" and contended that what the defense team did was not "materially different" from what the state does in the witness protection program, yet the defendant was being prosecuted for his conduct. The defendant argued that he wanted all records of the witness protection program and indicated that he did not see a security issue, as the court could order him not to disclose the information that he received to anyone.[30] In response, the state argued that because every person accepted into the witness protection program was different, there was no "certain threshold or certain type of blanket form that is filled out and submitted in order for someone to be accepted." Instead, these cases are handled on a case-by-case basis considering "what the situation is, what the danger is, what types of resources these individuals have that they can continue to rely on if, in fact, they're accepted into the program."

At the conclusion of the hearing, the court denied the defendant's omnibus motion in its entirety, granted the state's motion to quash, and overruled the defendant's objection to the state's motion to quash. In its ruling, the court first concluded that the evidence pre-

sented by the defendant did not justify an evidentiary hearing on the selective prosecution claim, and, since the threshold for an evidentiary hearing was not satisfied, the claim of selective prosecution also failed on the merits. In rejecting the defendant's claim that he had been singled out, the court disagreed with his attempt to analogize the present case to the witness protection program.[31] The court further found that the "defendant's unsupported assertions [did] not suffice to demonstrate that the defendant [was] the victim of invidious discrimination based on impermissible considerations." With regard to the motion to quash, the court concluded that the information sought fell within the "prosecutorial privilege" and that, given the purpose of the witness protection program, i.e., the protection of witnesses, and the court's reasoning in addressing the selective prosecution claim, the defendant had failed to demonstrate good cause for the release of the requested information. See Practice Book § 40-12.

On appeal, the defendant argues that the court erred in quashing the subpoena, thereby impairing his state and federal constitutional rights to present a defense, including a selective prosecution claim. The defendant contends that the subpoena was "sufficiently particularized so that the documents sought may be readily identified"; *Three S. Development Co.* v. *Santore*, 193 Conn. 174, 179, 474 A.2d 795 (1984); and that the materials were " 'highly relevant' " to his selective prosecution claim, which was part of his defense. See *State* v. *DeCaro*, 252 Conn. 229, 258, 745 A.2d 800 (2000). Without the information regarding the witness protection program, the defendant contends, he was not in a position to make the prima facie showing that is necessary to obtain an evidentiary hearing on a selective prosecution claim.[32]

We begin by noting that the standard of review applicable to the granting of a motion to quash and the denial of a request for an evidentiary hearing to prove selective prosecution is abuse of discretion. See *State* v. *Colon*, 272 Conn. 106, 265, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Perez*, 82 Conn. App. 100, 109, 842 A.2d 1187, cert. denied, 269 Conn. 904, 852 A.2d 734 (2004).

"In cases in which the defense of selective prosecution has been asserted . . . the defendant must prove (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right." (Internal quotation marks omitted.) *State* v. *Payne*, 100 Conn. App. 13, 19, 917 A.2d 43, cert. denied, 282 Conn. 914, 924 A.2d 139 (2007). "[A]n evidentiary hearing to prove selective prosecution is not a matter of right and is not available to every defendant, but

rather is to be granted at the discretion of the trial court following a prima facie showing by the defendant that a legitimate claim exists with regard to both prongs of the selective prosecution test." (Internal quotation marks omitted.) Id., 20.

"To warrant discovery [or an evidentiary hearing] with respect to a claim of selective prosecution, a defendant must present at least some evidence tending to show the existence of the essential elements of the defense . . . . Mere assertions and generalized proffers on information and belief are insufficient. . . . [T]o engage in a collateral inquiry respecting prosecutorial motive, there must be more than mere suspicion or surmise. If a judicial inquiry into the government's motive for prosecuting could be launched without an adequate factual showing of impropriety, it would lead far too frequently to judicial intrusion on the power of the executive branch to make prosecutorial decisions. Unwarranted judicial inquiries would also undermine the strong public policy that resolution of criminal cases not be unduly delayed by litigation over collateral matters. . . . When a request for an evidentiary hearing and a motion to dismiss on the basis of a defense of selective prosecution are rooted in mere speculative and unduly myopic assertions, a trial court does not abuse its discretion in denying an evidentiary hearing and motion to dismiss. . . . Furthermore, because the amount of evidence needed to support a selective prosecution claim on the merits is greater than that which justifies an evidentiary hearing, it necessarily follows that, when an evidentiary hearing is not warranted, a defendant's merits claim must also fail." (Citations omitted; internal quotation marks omitted.) Id., 20–21.

In the present case, the defendant presented no evidence that he was similarly situated to the individuals who administer the witness protection program. Although the defendant argued that his conduct was not materially different from the services that the state provides for witnesses in the witness protection program, that program is actually intended to protect witnesses from harm for having testified against a defendant. General Statutes § 54-82t.[33] As discussed previously, the bribery and tampering offenses with which the defendant was charged involved altering testimony or inducing false testimony from a witness. The defendant's subpoena, therefore, was overly broad in that it sought records regarding all benefits provided by the witness protection program, rather than records supporting a claim that benefits had been provided with the intent to alter testimony or induce false testimony. See *State* v. *Montgomery*, 254 Conn. 694, 728, 759 A.2d 995 (2000) ("[i]f the subpoena on its face is too broad and sweeping, it is subject to a motion to quash" [internal quotation marks omitted]). In addition, the subpoena sought information that is protected from disclosure by the witness protection statute. See Gen-

eral Statutes § 54-82t (j).[34] On the basis of the foregoing, we conclude that the court did not abuse its discretion in granting the state's motion to quash the subpoena.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] The jury reasonably could have found that Youmans' description of the woman matched the appearance of a woman named Doreen Stiles.

[2] The statement provides: "I was walking toward the store at-on Grand Avenue when I happened to see a black male, heavy set, come across the street and enter the store, and he frightened me, so I—I hid next door between the store and the alleyway of the barber shop, and while I was there I heard some arguing going on and I heard one of the, uh, black guys ask Mr. Vega for money and for him to open the safe, and then I heard a shot, a gun-shot. I—I panicked and got scared and I tried to—to leave, and when I turned, ya know, I got up from where I was and tried to go the opposite way, I saw two black males leave the store and after that I don't know what happened, which way they went or what happened after that."

[3] Stiles suffered from health problems at the time of the criminal trial and her testimony was videotaped while she was in a hospital.

[4] Gould and Taylor were acquitted of murder in violation of General Statutes § 53a-54a (a).

[5] Our Supreme Court ordered that Taylor's conviction of attempt to commit robbery in the first degree and robbery in the first degree be merged, and that the sentence on the conviction of attempt to commit robbery in the first degree be vacated. *State* v. *Gould*, 241 Conn. 1, 5, 695 A.2d 1022 (1997).

[6] Stiles described her initial encounter with the defendant as follows: "Well, he sat down and he said I've been working on this case a long time. He said he knows that, you know, there was no possible way that I could have been there because of something about a time difference with me regarding another witness; that if I had been there she would have seen me, and I guess she might have stated she didn't see me—I don't know—or whatever. It just was going on like that. And it was only, like, a few minutes, and then he asked me, he said, you really weren't there, were you? And I said, no."

[7] Stiles testified as follows:

"Q. Did . . . the defendant in this case, ever promise you future money, money in the future?

"A. Yes.

"Q. Could you tell us about that, please?

"A. Well, he told me that it depended [on] what happened with the trial.

"Q. And what—what did you understand him to mean by that?

"A. I understood it to mean that if Ronald [Taylor] and George [Gould] got out of jail that they might get some money, and they might—look, you know, in a way, like, kind of help me out if I needed some money.

"Q. Okay. Did you know where that money might come from? If they were going to get money, where would it come from?

"A. I don't know. I guess they might sue the state for being incarcerated."

[8] Stiles later testified that the defendant paid her rent for several months prior to the 2009 habeas trial.

[9] At the defendant's trial in 2013, Stiles testified that she lied in 1993 because, at that time, she was a drug user with no place to live and life was very hard. After the police picked her up, she testified, she was at the police station for so long that she started going through withdrawal, and the police purchased drugs, clothes and food for her, making it easy for her to continue with the lie. She further indicated that she changed her testimony in 2009 because she "had a chance to make right what [she] did wrong then," and she denied that the defendant had convinced her to change her testimony. At the defendant's trial in 2013, Stiles also testified that she was not outside La Casa Green on the morning of July 4, 1993, and did not see Taylor and Gould at that time.

[10] The habeas court rejected the claim of ineffective assistance of counsel, which also was raised in the habeas petition.

[11] The Supreme Court concluded that the habeas court improperly failed to recognize that, under the test set forth in *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997), actual innocence required affirmative evidence that Taylor and Gould did not commit the crimes of

which they were convicted, not simply the discrediting of evidence on which the conviction rested. *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 546–47, 22 A.3d 1196 (2011).

[12] John H. Bannon, Jr., an inspector with the chief state's attorney's office, testified that the reason Coppola and Rodriguez went to see Stiles before the Supreme Court decision reversing the first habeas court judgment was because Michael E. O'Hare, the senior assistant state's attorney who handled the first habeas appeal, "was quite confident that the Supreme Court would overturn the ruling in [the first] habeas [trial] and remand it for a second habeas trial."

[13] Stiles also indicated that the defendant told her not to worry, and that as long as she told the truth everything would work out.

[14] On September 15, 2015, this court affirmed the judgment of the second habeas court. *Gould* v. *Commissioner of Correction*, 159 Conn. App. 860, 123 A.3d 1259, cert. denied, 319 Conn. 957, 125 A.3d 1012 (2015).

[15] The court granted the defendant's motion for a judgment of acquittal as to one of the counts of tampering with a witness, and the jury found the defendant not guilty of the two perjury counts.

[16] The defendant points out that Stiles testified at his criminal trial that he did not convince her to change her testimony in the first habeas trial. Citing *Novak* v. *Anderson*, 178 Conn. 506, 508, 423 A.2d 147 (1979), the defendant contends that although it was the province of the jury to accept or reject Stiles' testimony, the jury in rejecting such testimony "cannot conclude that the opposite is true." (Internal quotation marks omitted.) The evidence was sufficient to convict the defendant of bribery of a witness, however, without the jury necessarily believing the opposite of Stiles' testimony. Rather, the jury could infer, on the basis of the evidence presented, that the defendant told Stiles that he believed her trial testimony was false and that the defendant then followed up with positive reinforcement for her recantation. The jury reasonably could infer that Stiles recanted in order to curry favor with the defendant, who told Stiles what he thought of her testimony.

[17] The defendant's conduct toward Stiles was similar to his conduct toward Youmans and Boyd. Youmans testified that the defendant had "stalked" her. Boyd testified that several years after she had testified in the criminal trial, the defendant located her and told her that he wanted to reopen the case. The defendant met with her on seven or eight occasions and would sometimes give her $20 for pizza. The jury was instructed that the evidence of cash gifts to Boyd was admitted "solely to show or establish a common plan or scheme to bribe and/or tamper with witnesses and may be used only for that purpose."

[18] On the basis of his investigation, Bannon was able to determine that the defendant purchased the television on May 12, 2007. He was unable to determine when and by whom the stereo was purchased.

[19] We similarly decline to reverse the defendant's conviction under our inherent supervisory authority over the administration of justice or under the plain error doctrine on the ground that the "one-witness-plus-corroboration" rule should apply to this case.

[20] "In *State* v. *Whelan*, supra, 200 Conn. 753 . . . we adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified in § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 768–69, 155 A.3d 188 (2017).

[21] The state objected to the defendant's cross-examination of Waddock on the ground that Stiles' 2006 statement was not in evidence and that the defendant was attempting to get it before the jury by reading from it.

[22] Section 8-6 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule *if the declarant is unavailable as a witness*: (1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing." (Emphasis added.)

In the present case, Stiles was available and testified at the defendant's trial.

[23] The court charged as follows: "Testimony has been presented that Doreen Stiles made a statement out of court inconsistent with her testimony at this trial. That on July 6, 2011, to [Detective] Sergeant [Tony] Reyes and [to Detective Alberto Matthew] Merced, she renounced her 2009 recantation of her 1995 testimony. You should consider this evidence only as it relates to the credibility of her testimony, not as substantive testimony. In other words, consider this evidence as you would any other evidence of inconsistent conduct in determining the weight to be given to the testimony of Doreen Stiles in this courtroom.

"Also in evidence as exhibits are prior statements of Ms. Stiles, specifically exhibits 17, 28 and 30. To the extent you find such statements inconsistent with her trial testimony here, you may give such inconsistency the weight to which you feel it is entitled in determining her credibility here in court. You may also use exhibits 17, 28 and 30 for the truth of their content and find facts from them. Remember, however, that you may not use [Detective] Merced's testimony as to Doreen Stiles' statement of July 6, 2011, for the truth of its content or find facts from it."

[24] We also note that prior to trial, the court inquired whether counsel would like the jurors to be able to take notes. Counsel for the defendant indicated that he preferred they not take notes. Subsequently, following cross-examination of Waddock, the jury sent a note to the court requesting notepads and pens to take notes. Counsel for the defendant expressed concern that to do so at that point in the trial could cause the jury to place more emphasis on what came after Waddock's testimony. The court declined to provide the notepads and pens at that stage of the proceedings.

[25] The defendant initially requested that we review this claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, the plain error rule; Practice Book § 60-5; and our supervisory authority over the administration of justice. The state responded that because the defendant had waived this claim pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), this claim failed to satisfy the third prong of *Golding*. In his reply brief, the defendant acknowledged that in *State* v. *Bellamy*, 323 Conn. 400, 403, 147 A.3d 655 (2016), our Supreme Court reaffirmed the validity of the *Kitchens* waiver rule. He also conceded that, in light of the fact that the "one-witness-plus-corroboration" rule enunciated in *State* v. *Sanchez*, supra, 204 Conn. 472, is a "quantitative rule of evidence"; id., 477; rather than an essential element of the crime that would implicate constitutional considerations, his instructional claim did not qualify for *Golding* review. Although not reviewable under *Golding*, the defendant's claim is still subject to the plain error doctrine, as a *Kitchens* waiver does not foreclose claims of plain error. See *State* v. *McClain*, 324 Conn. 802, 805, 155 A.3d 209 (2017). Similarly, the defendant's waiver does not preclude our review of this claim pursuant to our inherent supervisory authority over the administration of justice. See *State* v. *Fuller*, 158 Conn. App. 378, 391, 119 A.3d 589 (2015).

[26] The court included the corroboration requirement in its charge on the two perjury counts.

[27] Defense counsel argued that "the state has no idea what the next witness is going to say, and that's Doreen Stiles . . . whose lawyer has informed me that she intends to get on the . . . stand and say the police bullied her the first time and that [the defendant] did not induce her to change her testimony, and so the state, apparently—and it is an open question what Ms. Stiles will do apparently from moment to moment. Her testimony changes like the New England weather. But the state has in its possession and has announced privately an intention to seek to admit her prior testimony as *Whelan* testimony."

[28] The court stated: "Well, the problem . . . as I understand it, this witness has previously testified in one direction at the original murder trial and a completely different direction at the [first] habeas [trial] and then took the fifth amendment at [the second] habeas [trial]. I don't know how anybody could be confident with what she's going to say today, and I don't know that the state or anyone's current belief as to what she's going to state today, based upon a conversation with her attorney, is something that can be taken with great confidence.

"What her testimony will be is what her testimony will be, and under these circumstances, I don't see how anyone could have great confidence in what her testimony will be on direct and in the crucible of cross-examination."

[29] In the motion, the defendant requested "an order permitting him to inspect, copy, and have produced in court the number of any state witnesses accepted into the state's witness protection program, the terms of the wit-

nesses' acceptance into the program, the costs associated with the witnesses' participation in the program, whether any such witnesses or managers were prosecuted for offenses against the administration of justice, and any additional material . . . that may be relevant to the claims" set forth in the motion.

[30] The trial transcript states:

"The Court: You want every record with regard to the witness protection program. That would necessarily indicate the names of everybody in the witness protection program. That would necessarily indicate where they're routinely housed. That would necessarily indicate—it could necessarily indicate from what restaurants or groceries agents routinely obtain food for people that are housed in order to take it to them.

"[The Defendant's Counsel]: We want the very sort of details that the state is going to present against [the defendant] as to the benefits they provide to their witnesses. Now—

"The Court: Do you see a security problem involved for the individuals—

"[The Defendant's Counsel]: None.

"The Court: —per the essence of the program?

"[The Defendant's Counsel]: None; because you can order me not to disclose them to anyone, and that routinely happens in cases involving national security where defense counsel—limitations are placed upon defense counsel who are provided with access, who nonetheless have a right to present a defense."

[31] The court stated: "[T]he defendant is accused of bribing a witness to change her testimony. This situation is distinctly different and a far cry from incidences where the state, acting in its official capacity and pursuant to statute, offers goods and services to a witness who faces a potential risk of harm for testifying against a defendant charged with a serious criminal offense.

"The defendant has not provided any evidence to suggest that the state conditions that protection pursuant to the witness protection statute upon specific or favorable testimony from that witness, nor can this practice be gleaned from the statute.

"The plain language of the statute indicates that the primary policy concerning protecting witnesses facing a potential risk of harm for testifying against a defendant charged with a serious offense.

"The court cannot find that the state, acting in its official capacity in carrying out the mandates of the statutory witness protection program, is similarly situated to the defendant, who allegedly attempted to bribe a witness with a television in order to elicit favorable testimony."

[32] According to the state, this claim is moot because the defendant has challenged only the granting of the motion to quash, and not the court's ruling that he was not entitled to an evidentiary hearing on his selective prosecution claim. The defendant argues, however, that because the court granted the motion to quash, he was unable to make the prima facie showing that is necessary to obtain an evidentiary hearing on a selective prosecution claim. We, therefore, disagree that this claim is moot.

[33] A "[w]itness at risk of harm" is defined as a "witness who, as a result of cooperating in an investigation or prosecution of a serious felony offense, has been, or is reasonably likely to be, intimidated, harassed, threatened, retaliated against or subjected to physical violence." General Statutes § 54-82t (a) (2).

[34] General Statutes § 54-82t (j) provides: "Any record of the Division of Criminal Justice or other governmental agency that, in the reasonable judgment of the Chief State's Attorney or a state's attorney, would disclose or would reasonably result in the disclosure of the identity or location of any person receiving or considered for the receipt of protective services under this section . . . shall be confidential and not subject to disclosure under the Freedom of Information Act, as defined in section 1-200."