STATE OF CONNECTICUT *v.* TYRONE
DOUGLAS CAROLINA
(AC 33181)

Beach, Alvord and Bear, Js.

Argued March 5—officially released June 18, 2013

*Raymond L. Durelli*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Warren C. Murray*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Tyrone Douglas Carolina, appeals from the judgment of conviction, rendered after a jury trial, of two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), two counts of risk of injury to a child in violation of § 53-21 (a) (1) and one count of tampering with a witness in violation of General Statutes § 53a-151.[1] On appeal, the defendant claims that (1) the evidence was insufficient to convict him of the crime of tampering with a witness, (2) certain prosecutorial improprieties during closing arguments deprived him of his due process right to a fair trial and (3) the court abused its discretion when it admitted portions of the victim's recorded interview into evidence as a prior consistent statement. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The victim, K,[2] was living with her parents and her sister in their home in Danbury at the time of the incidents. K was born in 1993 and has attended special education classes since she began school. The defendant was close friends with K's parents and has known K from the time she was born. Although K is not related to the defendant, she had a good relationship with him and referred to him as her uncle. The defendant was a frequent visitor at K's house, occasionally sleeping there overnight, and he was aware of K's cognitive disabilities.

---

[1] The jury found the defendant not guilty of three charges of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1).

[2] In accordance with our policy of protecting the privacy interests of victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

On May 11, 2009, when K returned home from school, W, a family friend, noticed that K's behavior was unusual. K's cousin and her sister also were present at that time. They began questioning K, and she reluctantly revealed that the defendant had had sexual contact with her.[3] A few hours later, K's older brother, L, arrived at the house and saw that K was upset and shaking. He asked her to accompany him in his car so that they could talk in private. In response to L's questions, K told him of a recent incident in which the defendant had sexually molested her. The Danbury police department was contacted and officers arrived at K's house later that evening. Thereafter, the defendant was arrested and charged with offenses related to his sexual contact with K.

While the defendant was incarcerated awaiting trial, he mailed a letter to his cousin, Christopher Carolina, from the correctional institution. The defendant used his cellmate's name and prison number as the defendant's return address on the envelope. The defendant failed to write the name of Christopher Carolina as the addressee on the envelope, but he did include his cousin's correct mailing address. The letter was intercepted and held by a correction officer. The letter's contents were disclosed to the office of the state's attorney. In the letter, the defendant asked his cousin to remind Tierra LaPlant, the cousin's daughter, that she had spoken with K. In a prepared script, the defendant asked if his cousin remembered LaPlant's statements that she had spoken with K and that K had recanted the sexual molestation claims against the defendant. The defendant concluded by asking his cousin to "get

---

[3] According to the long form information, the incidents occurred in 2008 and 2009, when K was a high school student. Although a teenager, there was testimony at trial that K had the maturity level of an eleven or twelve year old child at the time of the incidents. The defendant was approximately thirty-nine years old when he had sexual contact with her.

[LaPlant] to confess that testimony again. . . . [Have LaPlant] make a phone call with that confession to my attorney. . . . Get to work." The defendant then was charged with tampering with a witness in violation of § 53a-151. All of the charges against the defendant were consolidated for trial.

Following a five day trial in September, 2010, the jury returned a verdict finding the defendant guilty of four counts of risk of injury to a child and one count of tampering with a witness. The trial court rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of twenty years incarceration, suspended after twelve years, followed by twenty years of probation. This appeal followed. Additional facts will be discussed where relevant to the claims on appeal.

I

The defendant's first claim is that the evidence was insufficient to convict him of the crime of tampering with a witness. Specifically, he argues that the state failed to prove beyond a reasonable doubt that he induced or attempted to induce a witness to testify falsely. According to the defendant, a person is guilty of tampering with a witness only if he intends that his conduct *directly* cause a particular witness to testify falsely. Although he admits that his letter could be construed as an attempt to induce LaPlant to testify falsely,[4] he claims that such conduct would not satisfy the elements of the crime because "[t]he letter was an attempt to induce the defendant's cousin to induce his daughter [LaPlant] to testify falsely. The letter never reached [LaPlant]. Therefore [LaPlant] was never aware of the defendant's attempts to induce her to testify falsely."

---

[4] At trial, LaPlant testified that she had not spoken with K and, in fact, had never met her.

The standard of review that we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Jennings*, 125 Conn. App. 801, 805, 9 A.3d 446 (2011).

Review of the defendant's claim must necessarily begin with the elements that the charged statute requires to be proved. Such a review involves statutory construction, which is a question of law. Our review, therefore, is plenary. See *State* v. *Pommer*, 110 Conn. App. 608, 613, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008).

Section 53a-151 (a) provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." The defendant does not contest the fact that an official proceeding was pending, but, rather, he argues that the state failed to present the evidence needed to show that he *directly* induced or attempted to induce LaPlant to testify falsely. We conclude that the state met its burden.

Because the defendant's letter was intercepted by a correction officer before it reached the defendant's cousin, LaPlant never became aware of the defendant's scripted testimony. A failed attempt, however, may violate the statute. "The language of § 53a-151 plainly warns potential perpetrators that the statute applies to *any conduct* that is intended to *prompt a witness* to testify falsely . . . in an official proceeding that the perpetrator believes to be pending or imminent." (Emphasis added.) *State* v. *Cavallo*, 200 Conn. 664, 668, 513 A.2d 646 (1986). A defendant is guilty of tampering with a witness "if he intends that his conduct directly cause a particular witness to testify falsely . . . ." Id., 672. So interpreted, § 53a-151 applies to conduct intentionally undertaken to undermine the veracity of testimony given by a witness. Id. The statute applies to successful as well as unsuccessful attempts to induce a witness to render false testimony. Id., 669.

The defendant's conduct, i.e., writing a letter to his cousin that solicited his help in securing LaPlant's false testimony, clearly is prohibited by § 53a-151. The statute is violated if the individual "attempts" to induce "a witness" to testify falsely. See General Statutes § 53a-151. The defendant, through his cousin as an intermediary, was attempting to induce LaPlant, as a witness, to testify falsely. "[A] witness . . . is any person summoned, or *who may be summoned*, to give testimony in an official proceeding." (Emphasis in original; internal quotation marks omitted.) *State* v. *Lee*, 138 Conn. App. 420, 439, 52 A.3d 736 (2012). If the defendant's cousin had complied with the defendant's request, LaPlant would have told defense counsel that K had recanted her allegations against the defendant. Most assuredly, LaPlant then would have been called as a witness to rebut K's testimony at trial.

The fact that the statutory language of § 53a-151 does not explicitly proscribe the exact method employed by

the defendant to induce the false testimony is of no consequence. The statute prohibits any conduct that is intended to prompt false testimony. *State* v. *Cavallo*, supra, 200 Conn. 668. "A statute need not exhaustively list the exact conduct prohibited." *State* v. *Coleman*, 83 Conn. App. 672, 677, 851 A.2d 329, cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005). Neither the statute nor the case law interpreting the statute requires that the request to testify falsely be made directly to the witness. The purpose of the statute would be thwarted if a defendant could avoid liability by inducing false testimony indirectly through an intermediary instead of communicating directly with the witness himself.

In the present case, from the evidence presented, the jury reasonably could have concluded beyond a reasonable doubt that the defendant intended that his letter would cause his cousin to contact LaPlant, that the cousin would provide LaPlant with the scripted false testimony and that LaPlant then would testify falsely as a witness during the defendant's criminal trial. In other words, the defendant's conduct was intended to directly cause LaPlant to testify falsely. Accordingly, we conclude that the state met its burden of proof with respect to the charge of tampering with a witness in violation of § 53a-151.

II

The defendant's next claim is that certain prosecutorial improprieties during closing arguments deprived him of his due process right to a fair trial. According to the defendant, "the prosecutor . . . improperly commented on the defendant's use of leading questions in an effort to bolster its case by enhancing [K's] credibility. The prosecutor argued that because the inconsistencies in [K's] testimony were the result of leading

questions by defense counsel, the jury should disregard that testimony."

The following additional facts are necessary to resolve this claim. K's testimony during trial contained several inconsistencies. The transcript reveals that she easily became confused and had difficulty recounting past events. At one point during the trial, when an offer of proof was made outside of the presence of the jury, K testified that she could not recall some of the testimony that she had given the previous day. The state's position was that the inconsistencies were due to K's developmental disabilities; the defendant argued that her testimony was inconsistent because her account of his conduct was a total fabrication.

During the trial, Donna Meyer, a certified forensic counselor and the coordinator of the multidisciplinary investigation team that investigated K's allegations of sexual molestation against the defendant, testified that she interviewed K and found her to be somewhat limited in her responses to Meyer's questions. Meyer testified: "It was clear to me that there were some limitations. And if questions were asked in an abstract way or were a little bit more complex, at times she didn't understand or wasn't really clear. So [K] really did best with simple and concrete questions." When Meyer was asked what types of questions she asked K during the interview, she responded that the questions were designed to elicit information from K. She explained that a leading question is a question "where you are suggesting the answer, where you are implying an answer that you want" and a misleading question "would be one where you actually introduce information that the child didn't say that was something you already knew was inaccurate." She further testified: "The problem with leading or misleading questions is that research has shown that the more often those questions are used, the more likely it is that there will be inaccuracies or suggestibility. Research

has shown that children can be suggestible. The younger ones more so than older, but also children with disabilities are also more suggestible. And so if somebody were to ask the child leading or suggestive questions repetitively, there's more likelihood that there would be inaccuracies or misinformation."

During the initial closing argument, the prosecutor offered reasons for the inconsistencies in K's testimony: "There can be honest mistake. There could be a memory problem, and there could be one other thing. And the state [is going to] make this argument. Sometimes inconsistencies can be inserted into a story through leading questions. That was the testimony of Donna Meyer. . . . [T]he cross-examination of [K] was laden with what we call leading questions. You can look at Donna Meyer's testimony . . . . She was a skilled, experienced, trained forensic interviewer. Donna Meyer said that information, when interviewing a child, should not come from the interviewer. It should come from the child. . . . The information should not come in the question, it should come from the child." The prosecutor then gave examples of the leading questions that defense counsel had asked K during cross-examination. The prosecutor argued: "Getting back to my basic point is dealing with inaccuracies and where they are coming from. Are they coming from a fabrication, or are they coming from a young girl with developmental disabilities who's being led? And Donna Meyer said that the leading questions can generate inaccuracies in testimony. . . . If you feel that leading questions have been responsible for generating inconsistent information, I don't think you should allow that inaccurate information to be used to construct an argument that she's fabricating."

In her closing argument, defense counsel first highlighted the inconsistencies in K's testimony. She then explained that her role as the defendant's attorney was

different from the role of a forensic interviewer. She argued that her client had been charged with heinous crimes and that it was her right to ask leading questions. In the state's rebuttal argument, the prosecutor acknowledged that defense counsel had the right to ask leading questions. He questioned, however, the accuracy of K's responses to those leading questions.

On appeal, the defendant claims that the prosecutor's remarks were improper and deprived him of a fair trial because they "bolstered [K's] credibility when he commented on the defendant's use of leading questions during cross-examination." "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . If we conclude that prosecutorial impropriety has occurred, we then must determine, by applying the six factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), whether the entire trial was so infected with unfairness so as to deprive the defendant of his due process right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Jordan*, 135 Conn. App. 635, 664, 42 A.3d 457, cert. granted on other grounds, 305 Conn. 918, 47 A.3d 388 (2012).

"[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 438, 902 A.2d 636 (2006). In light of the defendant's lengthy and focused attack on K's credibility based on the inconsistencies in her testimony, it was appropriate for the state to present the jury with an alternative to the defendant's contention that K must be lying. The prosecutor did not, as the

defendant claims, tell the jury that all of K's testimony in response to defense counsel's leading questions on cross-examination should be disregarded. Instead, the prosecutor argued that Meyer's testimony concerning a child's inaccurate responses to leading questions should be considered in evaluating the credibility of K. His comments were grounded in the evidence. The jury reasonably could infer, based on Meyer's testimony at trial, that K might have been confused or suggestible when responding to such questions, thereby resulting in inconsistencies in her testimony. We therefore conclude that the prosecutor's comments were not improper.

### III

The defendant's final claim is that the court abused its discretion when it admitted portions of K's recorded interview with Meyer as a prior consistent statement. He argues that prior consistent statements are generally inadmissible and are barred by the hearsay rule. He further claims that the court improperly failed to consider the timing of K's prior consistent statement in relation to K's inconsistent statements.

The following additional facts are necessary to resolve this claim. Meyer's interview with K took place on May 14, 2009, which was a few days after she had told W and L that the defendant had sexually molested her. When L testified at trial, he described the defendant's conduct as K had recounted it to him. At the time of her interview with Meyer, K's description of the sexual contact varied from the description she had given to L.[5] Shortly before her testimony at trial, K,

---

[5] K's recollection of the sexual contact varied as to whether there had been vaginal or anal penetration. Her recollection of the details surrounding the incidents also varied with respect to the type of clothes she was wearing, the time line of the incidents and whether the defendant whispered sexually suggestive comments to her.

with W and the prosecutor, watched her videotaped interview with Meyer to help her remember what had happened. At trial, K's testimony substantially was consistent with the statements she had given during the interview with Meyer. Defense counsel, during cross-examination, impeached K's credibility with K's previous statements to L and with various inconsistencies in her trial testimony. Frequently, during direct and cross-examination, K responded simply that she did not remember the events or details surrounding the events. The prosecutor subsequently requested that the taped interview with Meyer be admitted as a prior consistent statement.

The state argued that the entire videotape should be admitted because K had been impeached (1) on the basis that she lacked any independent recollection of the events and (2) through numerous inconsistent statements that she made during her cross-examination.[6] Defense counsel objected to its admission, arguing,

---

[6] The prosecutor, in support of his argument to admit the videotaped interview, stated: "First, she was impeached on the basis of the absence of any independent recollection of the events. . . . Through cross-examination, [K] was impeached by the fact that she did not have an independent memory of the event itself, that some time after giving the statement, she lost her recollection and her memory of the event, and now only has it because she has seen the video. The jury is left with that impression. The jury could so choose to believe this, that her only recollection of the event came from seeing the video. And that is a—that is the state of facts as it exists because of the cross-examination by [defense counsel]."

"[Second], [t]he thrust of the defendant's cross-examination has clearly been inconsistency and fabrication; fabrication that [K] does not receive as much attention as [her sister]; fabrication that, because [K] is afraid of her mother, who could be the source of disciplinary tirades; fabrication that she was brow-beaten by either [W] or [L]; fabrication that she was held captive in a court and would not be released until she made some sort of fabrication; fabrication that she wanted to avoid getting in some type of trouble.

"None of these pressures that I just referred to were present at the time the videotaped statement was given. So . . . I would offer the videotape statement as a prior consistent statement to rehabilitate [K] after she had been discredited."

inter alia, that K's inconsistencies were the result of fabricating the story, not a faulty memory. Defense counsel concluded: "I'm going to object to putting in the entire video or even portions of it."[7] The court indicated that it would make its evidentiary ruling as to the admissibility of the videotaped interview after it had reviewed the testimony referred to by the state and the defendant.

On September 8, 2010, the court made its ruling on the record. The court decided that "only those portions [of the interview] that related very specifically to the areas that were the basis of cross-examination and impeachment by the defense were properly admissible . . . ." The court provided the basis for its ruling: "[B]ased on the cross-examination and the impeachment, and the fact that the questions and the testimony that have gone before the jury have addressed issues relating to [K's] faulty memory, her inability to remember, the—what is arguably at this point a—a claim of fabrication or a made-up story on the part of [K], as well as the various inconsistencies and impeachment that has been addressed, the court's ruling is that the very limited area of the forensic testimony that relates

---

[7] In its appellate brief, the state argues that the defendant waived his claim relating to the admissibility of the videotaped interview. We are not persuaded. Following a conference in chambers on September 7, 2010, which was not recorded, the state produced a redacted version of the videotape and a transcript of the videotape as redacted on September 8, 2010. The state claims that on September 8, 2010, when the court made its ruling on the record and admitted the redacted videotape, defense counsel acknowledged that she had reviewed the redacted version, and it was " 'fine.' "

Our careful review of defense counsel's statements to the court at that time compels the conclusion that the defendant's claim was not waived. Defense counsel initially objected to the admissibility of the entire videotaped interview. After the court ruled that portions of the videotape would be admitted, defense counsel made no further objections with respect to the portions admitted after the redactions had been made. Defense counsel stated: "Your Honor's already made a ruling, so I have no position at this point." She never conceded, however, that they should be admitted, and she never withdrew her initial objection.

specifically to that may come in before the jury for issues of credibility and only for those issues. So I will give a limiting instruction that they not come in substantively."[8]

The defendant challenges the court's ruling allowing the admission of the redacted videotaped interview as K's prior consistent statement. "As a threshold matter, we set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Rose*, 132 Conn. App. 563, 570, 33 A.3d 765 (2011), cert. denied, 303 Conn. 934, 36 A.3d 692 (2012).

"As a general rule, a witness' prior consistent statements are inadmissible at trial. . . . Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein . . . also, they generally are prohibited even when offered for the limited purpose of rehabilitating the witness' damaged credibility. . . . The rationale upon which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it. . . .

---

[8] The redacted videotaped interview and transcript of the interview as redacted were admitted as exhibits during Meyer's testimony. After her testimony concluded, the court gave the jury an instruction as to the limited purpose for which they could be considered.

"This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached by a prior inconsistent statement . . . by the suggestion of bias, motive, or interest arising after the time the prior consistent statement was made . . . by a claim of recent fabrication . . . or by a claim of faulty memory. . . . When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 240 Conn. 395, 412–13, 692 A.2d 727 (1997).

In the present case, the court referenced two of the exceptions: (1) K's prior consistent statement was offered to rehabilitate her impeachment by prior inconsistent statements and (2) K's prior consistent statement was used to rehabilitate her as a witness with a faulty memory. The court expressly instructed the jury that K's prior consistent statement, as contained in the redacted videotaped interview with Meyer, could be used only in assessing K's credibility and not for substantive purposes. The record amply supports the court's decision and the basis for its evidentiary ruling, and the court correctly applied the law relating to the admissibility of prior consistent statements. According, we conclude that the court did not abuse its broad discretion in admitting the redacted videotaped interview as a prior consistent statement of K.

The judgment is affirmed.

In this opinion the other judges concurred.