******************************************

    The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

    All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

    The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* DAVID
G. LIEBENGUTH
(AC 39506)

DiPentima, C. J., and Sheldon and Devlin, Js.

*Syllabus*

Convicted, following a trial to the court, of the crimes of breach of the
peace in the second degree and tampering with a witness, the defendant
appealed to this court. His conviction stemmed from an incident in
which he allegedly confronted and made racial slurs toward a parking
authority officer, M, over a parking ticket, and subsequently e-mailed
M's supervisor suggesting why M should not appear in court to testify.
On appeal, the defendant claimed that the evidence adduced at trial
was insufficient to support his conviction of either charge. *Held*:

1. The trial court incorrectly concluded that the evidence adduced at trial
was sufficient to support the defendant's conviction of breach of the
peace in the second degree: that court's finding that the defendant twice
directed a racial slur at M in a belligerent tone, with an aggressive stance
and while walking toward him was clearly erroneous, as the defendant
was inside his car on both occasions when he made the racial slur, and
although the defendant used extremely vulgar and offensive language
that was meant to personally demean M, under the circumstances in
which he uttered that language it was not likely to tend to provoke a
reasonable person in M's position immediately to retaliate with violence,
and, therefore, because M was unlikely to have retaliated with immediate
violence to the conduct for which the defendant was charged, the defen-
dant's words were not fighting words on which he might appropriately
be convicted of breach of the peace; accordingly, his conviction of
breach of the peace in the second degree could not stand.

2. The evidence adduced at trial was sufficient to support the defendant's
conviction of tampering with a witness in violation of statute (§ 53a-151),
there having been ample evidence demonstrating that the defendant
intended to induce M to absent himself from a court proceeding; the state
presented evidence that the defendant sent an e-mail to M's supervisor
implying that he would press felony charges against M and cause M to
lose his job if he appeared in court to testify, but that he would let the
matter drop if M did not appear in court to testify, and the defendant's
claim that the e-mail did not constitute a true threat against M was
unavailing, as the state did not claim that the defendant tampered with
a witness by threatening him and, thus, was not required to prove, nor
was the trial court required to find, that the defendant threatened M in
order to establish that he sought to induce him not to testify for purposes
of § 53a-151, under which a defendant need not contact a witness directly
to be convicted.

(*One judge concurring in part and dissenting in part*)

Argued November 15, 2017—officially released April 17, 2018

*Procedural History*

Substitute information charging the defendant with
the crimes of breach of the peace in the second degree
and tampering with a witness, brought to the Superior
Court in the judicial district of Norwalk, geographical
area number twenty, and tried to the court, *Hernandez,
J.*; judgment of guilty, from which the defendant
appealed to this court. *Reversed in part*; *judgment
directed.*

*Joseph M. Merly*, with whom, on the brief, was *John
R. Williams*, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with

whom, on the brief, were *Richard J. Colangelo, Jr.*, state's attorney, and *Nadia C. Prinz*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, David G. Liebenguth, was convicted, following a bench trial, of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5) and tampering with a witness in violation of General Statutes § 53a-151. The charges were filed in connection with an angry confrontation between the defendant and a parking authority officer who had issued him a parking ticket, and a subsequent e-mail from the defendant to the officer's supervisor, suggesting why the officer should not appear in court to testify against him. The defendant now appeals, claiming that the evidence adduced at trial was insufficient to support his conviction of either charge. We affirm in part and reverse in part the judgment of the trial court.

The following evidence was presented at trial. Michael McCargo, a parking enforcement officer for the town of New Canaan, testified that he was patrolling the Morris Court parking lot on the morning of August 28, 2014, when he noticed that the defendant's vehicle was parked in a metered space for which no payment had been made. He first issued a ticket for the defendant's vehicle, then walked to another vehicle to issue a ticket, while his vehicle remained idling behind the defendant's vehicle. As McCargo was returning to his vehicle, he was approached by the defendant, whom he had never before seen or interacted with. The defendant said to McCargo, "not only did you give me a ticket, but you blocked me in." Initially believing that the defendant was calm, McCargo jokingly responded that he didn't want the defendant getting away. When the defendant then attempted to explain why he had parked in the lot, McCargo responded that his vehicle was in a metered space for which payment was required, not in one of the lot's free parking spaces. McCargo testified that the defendant's demeanor then "escalated," with the defendant saying that the parking authority was "unfucking believable" and telling McCargo that he had given him a parking ticket "because my car is white. . . . [N]o, [you gave] me a ticket because I'm white." As the defendant, who is white, spoke with McCargo, who is African-American, he "flared" his hands and added special emphasis to the profanity he uttered. Even so, according to McCargo, the defendant always remained a "respectable" distance from him. Finally, as the defendant was walking away from McCargo toward his own vehicle, he spoke the words, "remember Ferguson."

After both men had returned to and reentered their vehicles, McCargo, whose window was rolled down, testified that he thought he heard the defendant say the words, "fucking niggers." This caused him to believe that the defendant's prior comment about Ferguson had been made in reference to the then recent shooting of

an African-American man by a white police officer in Ferguson, Missouri. He thus believed that the defendant meant to imply that what had happened in Ferguson "was going to happen" to him. McCargo also believed that by uttering the racial slur and making reference to Ferguson, the defendant was trying to rile him up and escalate the situation. That, however, did not happen, for although McCargo found the remark offensive, and he had never before been the target of such language while performing his duties, he remained calm at all times and simply drove away to resume his patrol. Shortly thereafter, however, as he was driving away, the defendant drove past him. As he did so, McCargo testified that the defendant turned toward him, looked directly at him with an angry expression on his face, and repeated the slur, "fucking niggers." McCargo noted in his testimony that the defendant said the slur louder the second time than he had the first time.

After the defendant drove out of the parking lot, McCargo called his supervisor, who instructed him to report the incident to the New Canaan police. In his report, McCargo noted that there might have been a witness to the interaction, whom he described as a young white female. The defendant later was arrested in connection with the incident on the charge of breach of the peace in the second degree.

Next to testify was Mallory Frangione, the young white female witness to the incident whom McCargo had mentioned in his report. She testified that she parked in the Morris Court parking lot around 9:45 a.m. on the morning of August 28, 2014, and as soon as she opened her car door, she heard yelling. She then saw two men, McCargo and the defendant, who were standing outside of their vehicles about seventy feet away from her. She observed that the defendant was moving his hands all around, that his body movements were aggressive and irate, and that his voice was loud. She heard him say something about Ferguson, then say that something was "f'ing unbelievable." She further testified that she saw the defendant take steps toward McCargo while acting in an aggressive manner. She described McCargo, by contrast, as calm, noting that he never raised his voice, moved his arms or gesticulated in any way. McCargo ultimately backed away from the defendant and got into his vehicle. The defendant, she recalled, drove in two circles around the parking lot before leaving. Frangione testified that witnessing the interaction made her feel nervous and upset.

Karen Miller, McCargo's supervisor at the New Canaan Parking Department, also testified. Miller received an e-mail from the defendant at work on March 6, 2015. The e-mail, which was admitted into evidence, read as follows: "Please be advised that on March 12th at 2 p.m.[1] in a court of law in Norwalk, CT., I will prove beyond any reasonable doubt that your meter maid did

in fact commit multiple crimes against me, including at least one FELONY, as well as breaking CT vehicular/traffic laws in the operation of his vehicle and New Canaan town ordinances while on the job PRIOR to any false allegations of breach of peace in the second degree on my part. Additionally, as such, I also intend to subsequently invoke and pursue New Canaan town ordinances that would effectively require this meter maid to resign, or be terminated, from his position.

"Although it is not my desire to escalate this situation to the point a mans job, career, and lively hood is on the line, I must do what is necessary to prove my innocence. And in that course it will be proven your mater maid did in fact commit multiple crimes, including at least one FELONY, and infractions against me on that day BEFORE I was forced to react to his criminal actions against me.

"Of course if this is what you want to see happen I look forward to you and your meter maids presence in court next week. It goes without mention that if your meter maid does not show up in court this case will be over and everyone can go peacefully on their own way, no harm, no foul, no fallout.

"It's your choice now to make whatever recommendation you wish to your selectman. It will be MY CHOICE to defend myself from these false charges next week in court by proving (at minimum showing probable cause for an arrest!) your meter maid a criminal at best.a FELON at worst. Perhaps the judge will remand him to custody right then and there from his witness chair?

"Obviously not if he is not there."[2] (Footnote added.) Miller understood the e-mail to mean that McCargo should absent himself from court proceedings. McCargo also read the e-mail, the sending of which he described as a "scare tactic." He believed the defendant sent the e-mail in order to persuade him not to go to court and testify, and that if he did appear in court, the defendant would pursue negative repercussions as outlined in his e-mail.

After the state rested, the defendant moved for a judgment of acquittal on both counts, which the court denied. The defendant elected not to testify. The court, ruling from the bench, found the defendant guilty on both counts. It reasoned as follows: "In finding that the defendant's language and behavior is not protected speech, the court considers the words themselves, in other words, the content of the speech, the context in which it was uttered, and all of the circumstances surrounding the defendant's speech and behavior.

"The court finds that the defendant's language, fucking niggers directed at Mr. McCargo twice . . . is not protected speech. . . . The defendant's use of the particular racial epithet is in the American lexicon, there

is no other racial epithet more loaded with racial animus, no other epithet more degrading, demeaning or dehumanizing. It is a word which is probably the most [vile] racial epithet a non-African-American can direct towards an African-American. [The defendant] is white. Mr. McCargo is African-American.

"In light of this country's long and shameful history of state sanctioned slavery, Jim Crow segregation, state sanctioned racial terrorism, financial and housing discrimination, the word simply has . . . no understanding under these circumstances other than as a word directed to incite violence. The word itself is a word likely to provoke a violent response.

"The defendant is not however being prosecuted solely for use of this word. All language must be considered in light of its context.

"The court finds that considering . . . the content of the defendant's speech taken in context and in light of his belligerent tone, his aggressive stance, the fact that he was walking towards Mr. McCargo and moving his hands in an aggressive manner, there's no other interpretation other than these are fighting words. And he uttered the phrase not once but twice. It was directed—the court finds that it was directed directly at Mr. McCargo. There were no other African-Americans present . . . in the parking lot when it happened, and indeed Mr. McCargo's unease and apprehension at hearing those words was corroborated by Mallory Frangione who . . . said that she felt disconcerted by the defendant's tone of voice and his aggressive stance and actions.

"With respect to count two, the court has . . . similarly considered the words that were used in the e-mail, the subject e-mail. It finds that there is nothing in the evidence which suggests that in sending the e-mail, the defendant intended to comment or bring attention to a matter of public concern in a public forum.[3] . . .

"[T]he content . . . of the communication . . . itself was of an entirely personal nature. [The defendant] stated that he was willing to withdraw his claim which he now suggests was a matter of public interest, in exchange for a purely personal benefit, namely the withdrawal of criminal charges which were then pending against [him].

"So for those reasons, the court rejects the defendant's claim that either or both of these statements were protected first amendment speech." (Footnote added.) The court later sentenced the defendant as follows: on the charge of breach of the peace in the second degree, to a term of six months, execution suspended, followed by two years of probation on several special conditions, plus a $1000 fine; and on the charge of tampering with a witness, a consecutive term of four years incarceration, execution suspended, followed by four years of proba-

tion on the same special conditions and a $3000 fine. This appeal followed.

We begin with our standard of review. "It is well settled that a defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [fact finder's] verdict. . . .

"[T]he [fact finder] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [fact finder] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [fact finder] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty. . . . [T]he trier of fact may credit part of a witness' testimony and reject other parts. . . . [W]e must defer to the [fact finder's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude . . . ." (Citation omitted; internal quota-

tion marks omitted.) *State* v. *Raynor*, 175 Conn. App. 409, 424–26, 167 A.3d 1076, cert. granted, 327 Conn. 969, 173 A.3d 952 (2017).

I

The defendant first claims that the evidence was insufficient to support his conviction for breach of the peace in the second degree because the words he uttered to McCargo were protected speech under the first amendment to the United States constitution[4] and thus did not violate § 53a-181 (a) (5).

"Ordinarily, a jury or trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous. . . . Thus, we [generally] review the findings of fact . . . for clear error.

"In certain first amendment contexts, however, appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [into] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Citation omitted; internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 446–47, 97 A.3d 946 (2014). The court in *Krijger* also noted, however, that although an appellate court "review[s] de novo the trier of fact's ultimate determination that the statements at issue constituted a [breach of the peace], [the court] accept[s] all subsidiary credibility determinations and findings that are not clearly erroneous." Id., 447.

The defendant argues that the trial court's findings that he directed the phrase "fucking niggers" at McCargo "in context and in light of his belligerent tone, his aggressive stance, [and] the fact that he was walking toward Mr. McCargo and moving his hands in an aggressive manner" have no support in the evidence and, in fact, are contradicted by the evidence. Pursuant to

*Krijger*, we must examine the statements at issue to determine whether they are of such a character as to be protected under the first amendment. See *State* v. *Krijger*, supra, 313 Conn. 446. Upon conducting such an examination, we agree with the defendant that the court's findings are clearly erroneous.

"The starting point for our analysis is an examination of the statements at issue." Id., 452. The defendant does not contest the finding that he twice used the words "fucking niggers," or the finding that he directed those words at McCargo. Frangione, however, who was the only person to testify that the defendant ever walked toward McCargo while speaking to him, did not testify that she ever heard the defendant say the words "fucking niggers." McCargo, who did testify to hearing the defendant say those words, testified that the defendant "[stood] his ground" during the incident, staying at a "respectable" distance from him throughout. According to McCargo, the defendant was inside his car on both occasions when he said the words "fucking niggers." The trial court's finding that the defendant twice directed the phrase "fucking niggers" at McCargo, in a belligerent tone, with an aggressive stance and while walking toward him, is therefore clearly erroneous.

We continue our analysis to determine whether the defendant's speech, as supported by the evidence adduced at trial, could lawfully constitute a breach of the peace under the fighting words exception to the first amendment. Our Supreme Court recently discussed the type of speech that constitutes "fighting words," and thus is not protected by the first amendment, in *State* v. *Baccala*, 326 Conn. 232, 163 A.3d 1, cert. denied, U.S.    , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017). In *Baccala*, the defendant was convicted of breach of the peace in the second degree after a customer service dispute in a supermarket. Id., 233–34. The defendant customer called the supermarket to request that the store keep the customer service desk open until she arrived so that she could pick up a Western Union money transfer. Id., 235. The manager who answered her telephone call informed her that the desk was already closed and the services she sought were currently unavailable. Id. "The defendant became belligerent, responded that she 'really didn't give a shit,' and called [the manager] '[p]retty much every swear word you can think of' before the call was terminated." Id. A few minutes after the telephone call, the defendant arrived at the store, went inside, and proceeded directly to the closed customer service desk, where she attempted to fill out a money transfer form. Id. After the manager with whom she had spoken on the telephone told her once again that the customer service desk was closed for the day, the defendant "proceeded to loudly call [the manager] a 'fat ugly bitch' and a 'cunt' and said 'fuck you, you're not a manager,' all while gesticulating with her cane." (Footnote omitted.) Id.,

236. The manager remained calm during this outburst and responded to the defendant by telling her to have a good night, at which point the defendant left the store. Id. On appeal, our Supreme Court held that the foregoing evidence was insufficient to support the defendant's breach of peace conviction under settled first amendment principles; id., 237; "[b]ecause the words spoken by the defendant were not likely to provoke a violent response under the circumstances in which they were uttered." Id., 234.

"[A] proper contextual analysis," the court in *Baccala* wrote, "requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely."[5] Id., 250.

"[I]t is precisely this consideration of the specific context in which the words were uttered and the likelihood of *actual* violence, not an undifferentiated fear or apprehension of disturbance, that is required by the United States Supreme Court's decisions following *Chaplinsky* [v. *New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942)]. . . . Because the fighting words exception is concerned only with preventing the likelihood of actual violence, an approach ignoring the circumstances of the addressee is antithetical and simply unworkable." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 248. "[T]he fighting words exception is not concerned with creating symmetrical free speech rights by way of establishing a uniform set of words that are constitutionally proscribed. . . . Rather, because the fighting words exception is intended only to prevent the likelihood of an actual violent response, it is an unfortunate but necessary consequence that we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response." (Citation omitted.) Id., 249.

The court applied a two part test "[i]n considering the defendant's challenge to the sufficiency of the evidence to support her conviction of breach of the peace in the second degree in accordance with her first amendment rights . . . . First, as reflected in the previous recitation of facts, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether the trier of fact could have concluded from those facts and reasonable inferences drawn therefrom that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . Accordingly, to establish the defendant's violation

of § 53a-181 (a) (5) . . . in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response from an average store manager in [that woman's] position." (Citations omitted.) Id., 250–51.

The court continued: "At the outset of [our] examination, we must acknowledge that the words and phrases used by the defendant—'fat ugly bitch,' 'cunt,' and 'fuck you, you're not a manager'—were extremely offensive and meant to personally demean [the manager]. The defendant invoked one or more of the most vulgar terms known in our lexicon to refer to [the manager's] gender. Nevertheless, '[t]he question in this case is not whether the defendant's words were reprehensible, which they clearly were; or cruel, which they just as assuredly were; or whether they were calculated to cause psychic harm, which they unquestionably were; but whether they were *criminal*.' . . . Uttering a cruel or offensive word is not a crime unless it would tend to provoke a reasonable person in the addressee's position to immediately retaliate with violence under the circumstances." (Citation omitted; emphasis in original.) Id., 251–52.

In determining that the defendant's conduct in *Baccala* did not support a conviction for breach of the peace because the state did not prove beyond a reasonable doubt that the manager was likely to retaliate with violence, the court considered several factors. Id., 252. First, the court discussed the telephone call that preceded the in-person interaction: Because the defendant had already been belligerent to and directed swear words at the manager over the telephone, the manager "reasonably would have been aware of the possibility that a similar barrage of insults . . . would be directed at her." Id. Second, the court noted that store managers are routinely confronted by frustrated customers, who often express themselves in angry terms, and are expected in such situations to model appropriate behavior and deescalate the situation. Id., 253. Additionally, the manager had a significant degree of control over the premises where the confrontation took place and could have resorted to lawful self-help tools if the defendant became abusive, rather than responding with violence herself. Id. The court concluded that "[g]iven the totality of the circumstances in the present case . . . it would be unlikely for an on duty store manager in [her] position to respond in kind to the defendant's angry diatribe with similar expletives." Id. Finally, the court noted that the manager did not respond with profanity or violence, observing that "[a]lthough the reaction of the addressee is not dispositive . . . it is probative of the likelihood of a violent reaction." (Citation omitted.) Id., 254.

In this case, as in *Baccala*, the defendant used

extremely vulgar and offensive language, meant to personally demean McCargo.[6] Under the circumstances in which he uttered this language, however, it was not likely to tend to provoke a reasonable person in McCargo's position immediately to retaliate with violence. Although the evidence unequivocally supports a finding that the defendant at one point walked toward McCargo while yelling and moving his hands, there is no evidence that the defendant simultaneously used the racial slurs. The evidence unequivocally shows, instead, that the defendant was in his car both times that he directed the racial slurs toward McCargo.[7] McCargo did testify that the defendant's use of the slurs shocked and appalled him, and that he found the remarks offensive. He also testified, however, that he remained calm throughout the encounter and felt no need to raise his voice to the defendant. A reasonable person acting in the capacity of a parking official would be aware that some level of frustration might be expressed by some members of the public who are unhappy with receiving tickets and would therefore not be likely to retaliate with immediate violence during such an interaction. In reviewing the entire context of the interaction, we therefore find that because McCargo was unlikely to retaliate with immediate violence to the conduct for which the defendant was charged, the defendant's words were not "fighting words," upon which he might appropriately be convicted of breach of the peace. The defendant's conviction of breach of the peace in the second degree must therefore be reversed.

II

The defendant next claims that the evidence was insufficient to prove him guilty of tampering with a witness in violation of § 53a-151. That statute provides: "A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding." General Statutes § 53a-151. "[T]he witness tampering statute has two requirements: (1) the defendant believes that an official proceeding is pending or about to be instituted; and (2) the defendant induces or attempts to induce a witness to engage in the proscribed conduct." (Internal quotation marks omitted.) *State* v. *O'Donnell*, 174 Conn. App. 675, 690, 166 A.3d 646, cert. denied, 327 Conn. 956, 172 A.3d 205 (2017).

The defendant, however, has construed the state's charge as one of tampering with a witness by way of threatening conduct. He argues that his e-mail to McCargo's supervisor did not constitute a "true threat," and thus is entitled to first amendment protection, citing *State* v. *Sabato*, 321 Conn. 729, 742, 138 A.3d 895 (2016), for the proposition that "a defendant whose alleged

threats form the basis of a prosecution under any provision of our Penal Code . . . could be convicted as charged only if his statements . . . constituted a true threat, that is, a threat that would be viewed by a reasonable person as one that would be understood by the person against whom it was directed as a serious expression of an intent to harm or assault, and not as mere puffery, bluster, jest or hyperbole." (Internal quotation marks omitted.) Because the state did not claim that the defendant tampered with a witness by threatening him, his argument that his words did not constitute a "true threat" is unavailing.

"The language of § 53a-151 plainly warns potential perpetrators that the statute applies to any conduct that is intended to prompt a witness . . . to refrain from testifying in an official proceeding that the perpetrator believes to be pending or imminent. The legislature's unqualified use of the word 'induce' clearly informs persons of ordinary intelligence that *any conduct, whether it be physical or verbal, can potentially give rise to criminal liability*. Although the statute does not expressly mandate that the perpetrator intend to cause the witness to . . . withhold his testimony, the implicit requirement is apparent when the statute is read as a whole. . . . The legislature's choice of the verb 'induce' connotes a volitional component of the crime of tampering that would have been absent had it employed a more neutral verb such as 'cause.' Furthermore, the statute's application to unsuccessful, as well as successful, attempts to induce a witness to render false testimony [or refrain from testifying] supports our conclusion that the statute focuses on the mental state of the perpetrator to distinguish culpable conduct from innocent conduct." (Citations omitted; emphasis added.) *State* v. *Cavallo*, 200 Conn. 664, 668–69, 513 A.2d 646 (1986). "Although *Cavallo* discusses § 53a-151 in the context of inducing someone to testify falsely or to refrain from testifying, we conclude that its holding that the language of § 53a-151 plainly warns potential perpetrators applies equally to situations in which a defendant attempts to induce someone to absent himself or herself from a proceeding." *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 57–58 n.9, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004). "[A] defendant is guilty of tampering with a witness only if he intends that his conduct directly cause a particular witness to testify falsely or to refrain from testifying at all." *State* v. *Cavallo*, supra, 672.

In *State* v. *Bennett-Gibson*, this court stated that "[t]o prove inducement or an attempt thereof, the evidence before the jury must be sufficient to conclude that the defendant's conduct was intended to prompt [the complainant] to absent herself from the proceeding. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . .

The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citation omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Bennett-Gibson*, supra, 84 Conn. App. 53.

A defendant need not contact a witness directly to be convicted under § 53a-151. In *State* v. *Carolina*, 143 Conn. App. 438, 69 A.3d 341, cert. denied, 310 Conn. 904, 75 A.3d 31 (2013), this court upheld the conviction of a defendant who had written a letter to his cousin in which he asked his cousin to pass along scripted false testimony to a potential witness against him. Id., 440–42. The letter was intercepted by a correction officer and did not reach the cousin; therefore, the witness did not become aware of the defendant's scripted testimony. Id., 444. The defendant claimed that "[t]he letter was an attempt to induce [his] cousin to induce [the witness] to testify falsely," but since the letter never reached the witness, the witness "was never aware of the defendant's attempts to induce her to testify falsely." (Internal quotation marks omitted.) Id., 442. This court upheld the defendant's conviction under § 53a-151, noting that "[t]he purpose of the statute would be thwarted if a defendant could avoid liability by inducing false testimony indirectly through an intermediary instead of communicating directly with the witness himself." Id., 445.

In this case, the trial court had ample evidence that the defendant intended to induce McCargo to absent himself from the court proceeding. The state presented evidence that the defendant sent an e-mail to McCargo's supervisor implying that he would press felony charges against McCargo and cause McCargo to lose his job if he appeared in court to testify, but that he would let the matter drop if McCargo did not appear in court to testify. The defendant's claim that his e-mail did not constitute a "true threat" against McCargo is unavailing. The state was not required to prove, nor was the trial court required to find, that the defendant threatened McCargo in order to establish that he sought to induce him not to testify. The language of the defendant's e-mail clearly indicates that the defendant intended to induce McCargo not to appear in court, insofar as it stated: "It goes without mention that if your meter maid does not show up in court this case will be over and everyone can go peacefully on their own way, no harm, no foul, no fallout" and "[p]erhaps the judge will remand him to custody right then and there from his witness chair? Obviously not if he is not there." That is all that is required for a conviction on this charge. We therefore affirm the defendant's conviction of tampering with a witness.

The judgment is reversed only as to the defendant's conviction of breach of the peace in the second degree and the case is remanded with direction to render a judgment of acquittal on that charge and to resentence the defendant on the charge of tampering with a witness; the judgment is affirmed in all other respects.

In this opinion, DiPENTIMA, C. J., concurred.

[1] The court took judicial notice that there was a scheduled court date related to the breach of peace charge on March 12, 2015.

[2] The spelling and capitalization in the e-mail as quoted are per the original.

[3] On appeal, the defendant did not pursue his claim that his e-mail was protected speech as a matter of public concern.

[4] The defendant also claims his conduct was protected by article first, §§ 3, 4 and 14, of the Connecticut constitution. Because this claim is not independently briefed, we do not reach the defendant's claim pursuant to the Connecticut constitution. See, e.g., *State* v. *Outlaw*, 216 Conn. 492, 501 n.6, 582 A.2d 751 (1990).

[5] Our Supreme Court also noted that "[a] proper examination of the context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made. . . . Courts have, for example, considered the age, gender, race, and status of the speaker." (Citations omitted.) Id., 241–42.

[6] Our dissenting colleague notes, as did the trial court, that the word "nigger" is vile and offensive, and that its use perpetuates historically discriminatory attitudes about race that regrettably persist in modern society. We agree entirely with those observations. We reiterate, however, that, under our law, it is the context in which such slurs are uttered that determines whether or not their utterance is so likely to provoke a violent response as to constitute fighting words, for which criminal sanctions may constitutionally be imposed.

[7] The dissent also points to two cases cited in *Baccala*, in which it contends that the word "nigger" was held to constitute a constitutionally unprotected fighting word. The *Baccala* court cited the two cases, *In re Spivey*, 345 N.C. 404, 480 S.E.2d 693 (1997), and *In re John M.*, 201 Ariz. 424, 36 P.3d 772 (App. 2001), for the related propositions that a proper contextual evaluation of speech as alleged fighting words involves consideration of: the personal characteristics of the speaker and the person to whom his words are addressed, such as their ages, genders, races and respective statuses; *State* v. *Baccala*, supra, 326 Conn. 241–43; and the likelihood that the average listener with those personal characteristics would respond with violence to such speech if it were addressed to him in the circumstances of the case before the court. Id., 243. We respectfully submit that in those two cases, it was the particular circumstances in which the word "nigger" was uttered that made its use unprotected by the first amendment, and that nothing in those cases suggests that that word is always an unprotected fighting word.